# Exhibit 2

**DECLARATION OF ATTORNEYS' FEES EXPERT DAVID L. WILEY ON ATTORNEYS' FEES FOR EDITH K. THOMAS IN *EEOC V. SKYWEST AIRLINES, INC.*, NO. 3:22-CV-1807-D (N.D. TEX.) ("*EEOC V. SKYWEST* CASE")**

1.      My name is David Linwayne Wiley. I am an attorney in good standing and licensed to practice law in the State of Texas and in all four federal district courts in Texas. I have practiced in all four of those federal district courts. I am a principal in the Dallas-based law firm of Gibson Wiley PLLC.

## QUALIFICATIONS

2.      **I focus my practice of law on representing workers in employment law matters—primarily in litigation.** That has been the primary focus of my legal practice for over two decades. This focus has put me in contact with other lawyers in Texas who also focus their practices on employment law. Through that contact, I have developed an understanding of hourly rates for attorneys who practice employment law in Texas. Through that contact, I also have developed an understanding of the varying degrees of expertise of lawyers who practice employment law and who litigate employment cases. Below are some examples of involvement that help inform my developed understanding of those degrees of expertise.

3.      **I actively participate in employment law bar activities**. I was selected for, and from about 2009 to 2023, I served on the governing council of the State Bar of Texas ("SBOT") Labor and Employment Law Section ("L&E Section"). I am a past Chair of the L&E Section and served two terms as Chair Emeritus of the L&E Section. My understanding is that as of December 31, 2023, the L&E Section had about 3,176 members. Only a few lawyers are selected to govern that section via voluntary service on a governing council. There is an approximate balance between worker-side lawyers and management-side lawyers on the council. The council is charged with such duties as (1) overseeing membership qualifications; (2) assessing applications and awarding grants for pro bono activities in the field of labor and employment law; (3) reviewing and awarding grants for scholarship in the field of labor and employment law; (4) planning both basic and advanced continuing legal education ("CLE") programs for lawyers in the field of labor and employment law; and (5) communicating with lawyers in Texas who practice labor or employment law. As part of my voluntary duties for the council, I assisted in planning CLE programs for the L&E Section via selection of topics and speakers. I did this yearly since being elected to serve on the council. I did this for the annual SBOT Labor and Employment Law Institute and sometimes also for the annual SBOT Advanced Employment Law course.

4.    **I maintain active memberships in employment law associations.** Since about 2003, I have maintained an active membership in the Texas Employment Lawyers Association ("TELA"). TELA is a voluntary bar association of Texas lawyers who regularly represent people rather than companies in employment matters. Since 2017, I have served on the Board of Directors for TELA. As of May 5, 2019, I was the elected President of TELA, and in Spring of 2023, I finished my second two-year term in that position. I am no longer president of that organization (having hit the term limit permitted under the bylaws of that organization), but I still serve on its Board of Directors as Immediate-Past President. I am an active member of the DFW Affiliate of the National Employment Lawyers Association. I previously chaired its speakers committee, recruiting and coordinating speakers for monthly CLE presentations on employment law and its practice in the Dallas-Fort Worth area.

5.    **I frequently teach other lawyers about employment law.** Over the course of more than two decades, I have spoken at numerous CLE and human resources seminars on a variety of employment law topics. In connection with such seminars, I have written and presented numerous papers on employment law topics. The following are examples of presentations I made in the last several years (this is not an all-inclusive list):

| DATE | PRESENTATION TOPIC | VENUE |
|---|---|---|
| 01/13/23 | Attorneys' Fees | SBOT 31st Annual Advanced Employment Law Course in Dallas |
| 04/20/22 | Common written discovery issues in employment cases | SBOT 30th Annual Employment Law 101 Course in Austin |
| 07/13/21 | Use of focus groups to prepare for trials of employment cases | Houston Affiliate of the National Employment Lawyers Association Meeting |
| 04/23/21 | Use of focus groups to prepare for trials of employment cases | Texas Employment Lawyers Association Annual Spring Seminar |
| 01/13/21 | Professionalism and dealing with opposing counsel | SBOT 29th Annual Employment Law 101 Course in Dallas |

| 05/10/19 | HR systems | UTCLE 26th Annual Labor and Employment Law Conference in Austin |
| --- | --- | --- |
| 01/17/19 | Discovery issues in employment litigation | SBOT 27th Annual Advanced Employment Law Course at the Westin Galleria in Dallas |
| 01/17/18 | Professionalism and dealing with opposing counsel | SBOT 26th Annual Advanced Employment Law Course at the Westin Galleria in Dallas |
| 09/20/16 | Shooting from the HIP(AA): Avoiding misfires when handling medical info in litigation | SBOT L&E Section 27th Annual Labor and Employment Law Institute at the JW Marriott Galleria in Houston |
| 09/09/16 | Discovery issues in employment litigation | SBOT Legal Access Division Employment Law Task Force Meeting |
| 06/16/16 | Ethics & professionalism in employment law | SBOT Annual Meeting of the Labor and Employment Law Section in Fort Worth |
| 09/20/15 | Ethics & professionalism panel: What the Court and Jury see and hear (co-presenters Chief U.S. District Judge Fred Biery and Marcia Jackson of Wick Phillips) | SBOT L&E Section 26th Annual Labor and Employment Law Institute at the JW Marriott in San Antonio |
| 01/21/15 | Discovery questions: What do you ask (co-presenter Shafeeqa Watkins Giarratani then at Norton Rose Fulbright) | SBOT 23rd Annual Advanced Employment Law Course (Employment Law 101 Section) at the Westin Galleria in Dallas |
| 01/18/13 | e-Discovery | SBOT 22nd Annual Advanced Employment Law Course at the Westin Galleria in Dallas |

| 09/14/12 | Avoiding and winning discovery (co-presenter Shannon Schmoyer of Schmoyer Reinhard LLP) | SBOT L&E Section 2012 Labor and Employment Law Institute at the JW Marriott in San Antonio |
| 01/26/12 | Discovery and common written discovery issues (co-presenter Shannon Schmoyer of Schmoyer Reinhard LLP) | SBOT 20th Annual Advanced Employment Law Course at the Westin Galleria in Dallas |
| 03/23/11 | Common discovery issues in employment litigation (with co-presenters Enrique Chavez of the Chavez Law Firm, Shannon Schmoyer of Schmoyer Reinhard LLP) | SBOT Webcast from SBOT Studio in Austin |

6.      **I have received peer recognition for my practice of employment law.** In the years 2007, 2008, and 2009, the Texas Super Lawyers edition of Texas Monthly Magazine listed me as a "Rising Star" in the field of plaintiff's employment litigation. In the years 2017, 2018, 2019, 2020, 2021, 2022, 2023, and 2024 the Texas Super Lawyers edition of Texas Monthly Magazine listed me as a "Super Lawyer" in the field of plaintiff's employment litigation. My understanding is that this selection is based off an evaluation of 12 indicators including peer recognition and professional achievement in legal practice. I did not ask anyone to vote for me and did not campaign for inclusion.

7.      **I have an excellent legal education and federal trial-level judicial clerkship experience.** I am a 1996 graduate of the St. Mary's University School of Law in San Antonio, Texas. During law school, the St. Mary's Law Journal published a paper I wrote on the topic of physical appearance discrimination: *Beauty and the Beast: Physical Appearance Discrimination in American Criminal Trials*, 27 St. Mary's L.J. 193 (1995)—a paper that is still cited among academics globally, including in materials used for a symposium in October of 2021 at Ankara Yıldırım Beyazıt University in Ankara, Turkey. During law school, I served as a Comment Editor on the Editorial Board of the St. Mary's Law Journal—a journal that received accolades for being among the most cited law journals in the nation. After graduating, I worked two years as a law clerk for a federal district judge in New Orleans. During my judicial clerkship, I provided substantial assistance to the court in the trial of several employment law cases and in preparing rulings on matters ranging from dispositive motions to pretrial filings to evidentiary issues to discovery disputes. I also provided substantial assistance in preparing such rulings in other types of complex litigation such as securities litigation, intellectual property litigation, CERCLA litigation, and civil RICO litigation.

8.     **I have experience as a management-side defense attorney in employment cases.** Following the end of my clerkship in 1998, I practiced law for about 2 years in the Nashville, Tennessee offices of King & Ballow—a nationally-renowned labor and employment defense firm. During that time, I counseled employers in employment law matters and deposed plaintiffs and witnesses in various employment law cases involving allegations of age discrimination, race discrimination, and sexual harassment. The work I performed involved interaction with courts and attorneys in various parts of the Southeast and Midwest, including Indiana, Ohio, Kentucky, Mississippi, Louisiana, and Tennessee. During that time, I frequently made speeches to human resources personnel on employment law topics at programs organized by the Council on Education in Management and Lorman Education Services.

9.     **I have experience practicing commercial litigation at a big Dallas-based law firm.** I left King & Ballow voluntarily to accept an associate position in the Dallas offices of Jenkens & Gilchrist, P.C. I understood Jenkens & Gilchrist, P.C. was one of the largest firms in Texas at the time. I worked there for about eighteen months in its commercial litigation section. At the time, that section included about sixty litigators. While there, I worked on commercial, intellectual property, telecommunications, and franchise litigation. From that experience, I gained knowledge of difficulties in prosecuting commercial litigation. At the time I left Jenkens & Gilchrist, P.C. my regular billable hourly rate was $255 per hour.  That was in 2002 and at a time when I was only about six years out of law school. Without any adjustment for the twenty-something years of improved quality of legal services garnered through all the training, continuing legal education, and experience I have since that time—and *only* adjusting for inflation using the consumer price index for legal services generated by the United States Bureau of Labor Statistics—that same rate for a six-year lawyer at the end of 2023 would be $512.15 [prices for legal services were 100.84% higher in 2023 versus 2002 (a $257.15 difference in value)]. And again, that is without accounting for any improvement in the *quality* of legal service over twenty-one years or experience beyond that approximate six years. It is just looking at the monetary equivalent of that $255 per hour rate for an approximate six-year lawyer with my experience in that time period in today's dollars—$512.15 per hour.

10.     **I have experience running a law firm that provides representation to workers in employment matters.** I left Jenkens & Gilchrist, P.C. voluntarily to open a solo practice dedicated primarily to representing individuals in labor and employment disputes. This was sometime in the first few months of 2002. I managed my solo practice law firm for about one year. I then accepted an invitation to merge my practice into the predecessor of the law firm of which I am now a principal: Gibson Wiley PLLC.

11.     **I am familiar with the difficulties of maintaining a practice dedicated to helping individual workers in employment matters—experienced worker-side attorneys are**

**relatively rare.** It is my opinion, based on my experience outlined above, that economic considerations can dissuade practitioners from entering, or remaining, in such a practice. I have known lawyers who started a worker-side employment law practice and later switched sides or changed focus for economic reasons. In employment cases, there are often caps on recovery, limits on kinds of recoverable damages and costs, and the recovery itself can take years. The following information is based on my own experience, my work as co-chair of the SBOT L&E Council Membership Committee, my review of SBOT data that is publicly available on its website, and my interaction with attorneys on both sides of employment litigation. In my opinion, there are many more lawyers in Texas who focus their full-time law practice on the management side of employment law—representing entities—than there are who focus their full-time law practice on representing individual workers in employment law matters. Practicing on the management side carries less financial risk: It often involves solvent client companies that can pay lawyers' hourly bills and retainers that either guarantee payment or guarantee final payment. It usually involves receipt of a regular paycheck for the lawyer and comparatively steady income regardless of whether the client wins or loses. Management-side representation can be substantively easier because the employee usually bears the burden of proof, and it is easier to pick apart legal elements of an employee's claim than it is to build a winning case by proving every element. When I last checked, the SBOT reports about 113,771 active members—but the entire membership of the SBOT L&E Section was only about 3,176 as of the end of December of 2023. That *includes* those who practice law full time on the management side. In my opinion, there are relatively few attorneys who start and keep a full-time worker-side employment law practice.

12.    **I have trial experience and have prosecuted and won employment law cases in Texas.** I served (or currently serve) as counsel of record for the employee / former employee in employment disputes in Houston, Dallas, Fort Worth, Beaumont, Abilene, Austin, Midland, Domino, Denton, Plano, Marshall, Amarillo, Anson, and Granbury. I have represented (or currently represent) clients who live in an even wider range of geographic areas and are from various walks of life—from low-wage workers to executives. The cases in which I have served (or currently serve) as counsel of record include various unlawful employment practices such as employers' failure to comply with agreements, refusal to pay or underpayment of wages, discrimination, harassment, and retaliation. Amy E. Gibson and I have won jury verdicts for clients in employment law cases in Texas. For example, in *Carter v. City of Abilene*, Cause No. 10138-D, 350th Judicial District Court, Taylor County, Texas, a whistleblower retaliation case, we won a $2m+ jury verdict in Abilene and against the City of Abilene. In *Jackson v. Granbury SNF LLC, et al.*, Cause No. C2021152, 355th Judicial District Court, Hood County, Texas, a retaliation case for a social worker fired from a skilled nursing facility, we won a $8.5m jury verdict. TopVerdict.com is "an online journal dedicated to compiling and publishing annual lists of the largest financial recoveries ('case results') obtained by U.S.-based attorneys/law firms on behalf

of their clients, around the Nation." I was recently informed by that journal that our jury verdict in *Jackson* was "the Number 1 Verdict in Texas in 2023 in the following categories (respectively): Wrongful Termination, Whistleblower Retaliation" and nationally, "one of the Top 20 Labor & Employment Verdicts in the United States in 2023."

## ATTORNEYS' FEES

13.    **I am familiar with the applicable considerations courts and juries are instructed to use under *Texas state law* in addressing the reasonableness of attorneys' fees.** In 2019, the Texas Supreme Court published an opinion in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, which addressed reasonable and necessary attorneys' fees. The starting point for calculating attorneys' fees is the base lodestar figure. The lodestar is a number representing hours multiplied by an hourly rate. This requires some evidence of (1) the particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) a reasonable amount of time required to perform the services, and (5) a reasonable hourly rate for each person performing such services. For a reasonable hourly rate, *Rohrmoos* gives us a non-exclusive list of considerations. *Rohrmoos* says it "usually" includes "at least" these considerations: (1) "the time and labor required," (2) "the novelty and difficulty of the questions involved," (3) "the skill required to perform the legal service properly," (4) "the fee customarily charged in the locality for similar legal services," (5) "the amount involved," (6) "the experience, reputation, and ability of the lawyer or lawyers performing the services," (7) "whether the fee is fixed or contingent on results obtained," (8) "the uncertainty of collection before the legal services have been rendered," and (9) "results obtained." A reasonable hourly rate does not depend on the fee agreement between the prevailing party and his attorney. A reasonable hourly rate depends on all the relevant considerations for a particular case. That may include fewer than all the considerations listed above, or it may include more than the considerations listed above.

14.    **I am familiar with considerations courts use under *federal law* to address the reasonableness of attorneys' fees.** The United States Supreme Court published an opinion in *Blum v. Stenson*, 465 U.S. 886 (1984), which addressed attorneys' fees. In it, the United States Supreme Court noted courts use the "prevailing market rates in the relevant community." Then in *Purdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010), the United States Supreme Court explained that the lodestar method (hours x rate) has become the "guiding light" in fee-shifting jurisprudence and has "several important virtues." First, it looks to the "prevailing market rates in the relevant community" referenced in *Blum*. It "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." Second, it is "readily administrable" and—unlike the Fifth Circuit's prior approach in *Johnson v. Georgia Highway Express, Inc.*, 488 F.3d 714 (5th Cir.

1974)—is objective. Still, federal courts may consider any relevant factors, including factors from *Johnson*, in determining the lodestar. For example, as explained in *Blum*, the risk of loss in contingency cases is subsumed in the lodestar analysis. Those *Johnson* factors largely overlap the Texas state *Rohrmoos* factors referenced above. Those *Johnson* factors are (1) time and labor required, (2) novelty and difficulty of issues, (3) skill required, (4) loss of other employment in taking the case, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by client or circumstances, (8) amount involved and results obtained, (9) counsel's experience, reputation, and ability, (10) case undesirability, (11) nature and length of relationship with the client, and (12) awards in similar cases.

### ATTORNEYS' FEES: REASONABLE HOURLY RATES

### Time and Labor Required

15.    **I am familiar with the time and labor required to bring an employment case to trial**. To get to trial of an employment case can take anywhere from as few as six months—on some known "rocket dockets" like in the federal courts of East Texas or Eastern Virginia—to as many as about ten years when a case hits procedural snags, stays, changes of counsel, interlocutory appeals, etc. What is more common is something between—like 18 months to 3 years. To prepare a case well for a jury trial, and try it, can take *hundreds* and sometimes *thousands* of hours of work performed collectively by more than one lawyer—and that is if the lawyers are experienced; they have some efficiencies handling pretrial projects that come with that experience. With employment cases, it takes time to learn a lot about the underlying relationship an employee had with his employer. That covers a lot. People may work about 8 hours per weekday with an employer, 5 days per week. Successful prosecution of an employment case can require extensive knowledge of that underlying relationship because sometimes employers may defensively use events that happened long before but only raise them during a trial with no or minimal notice. Particularly so when the employment actions at issue occurs over a long period of time—like creation or maintenance of a hostile working environment. After all, the relationship between opposing parties in a catastrophic truck wreck may have only lasted seconds [the time of the crash]. But the relationship between opposing parties in an employment discrimination case may have been ongoing for years. Also, the employer may control much of the evidence in an employment case, so there can sometimes be numerous disagreements over discovery that may have to be resolved.

16.    **I am familiar with the time and labor courts have found to be reasonable in prosecuting a single-plaintiff employment case through trial—and time and labor attorneys have claimed to have reasonably worked even when a case does not go to trial.** Single-plaintiff employment cases can sometimes take thousands of hours to

successfully prosecute through to a jury verdict: Like in *Miniex v. Houston Housing Authority*, Civil Action No. 4:17-0624 (S.D. Tex. Sept. 13, 2019), ECF No. 277. In *Miniex*, a general counsel successfully sued her former employer over her unlawful retaliatory firing for engaging in activity protected by the False Claims Act. Judge Nancy F. Atlas determined that **2,423 hours** of labor was reasonable and recoverable for prosecution of the case—which included work over about a 2-year period, concluding with a 6-day jury trial. Though the *Miniex* case was tried in the United States District Court for the Southern District of Texas, the number of hours it can take to successfully prosecute an employment case does not—in my experience and opinion—vary much by district. Or like in *Johnson v. Southwest Research Institute*, No. 5:15-cv-297 (W.D. Tex. Aug. 23, 2019), ECF No. 176. In *Johnson*, an employee successfully sued her former employee over her unlawful retaliatory firing. Judge Royce C. Lamberth determined that **1,178.4 hours** of labor was reasonable and recoverable for prosecution of the case—which included the work of a 5-person legal team and concluded with a week-long trial. I am also aware of testimony in *Thomas v. Cook Children's Health Care System*, No. 4:20-cv-01272-O [Doc. 138-1] PageID 11174-83 (N.D. Tex. May 16, 2022). *Thomas* was a single-plaintiff employment discrimination case. The court granted summary judgment for defense. No trial was had. Defense sought fees for defending the case through summary judgment. Defense proffered testimony of a partner in the law firm of Winston & Strawn, LLP, Geoffrey S. Harper — one of the defense attorneys in the case. Collectively, counsel for defense in *Thomas* contended that defense spent about **5,838.90 hours** between sixteen lawyers, with no trial, and that this time was both reasonable and necessary. *See id.* ECF No. 138-1, at pp. 7-8, PageID #11180-81, ¶¶ 17-18 ("I strongly believe that the work was reasonable and necessary for the defense of this case."). I am also aware of *MWK Recruiting, Inc. v. Jowers*, No. 1:18-cv-00444-RP (W.D. Tex. Jan. 29, 2024), ECF No. 427. *Jowers* was an employment dispute involving an employment agreement. Judge Robert Pitman determined that the attorneys prosecuting that case reasonably spent **3,291 hours** between five attorneys doing so. *See id.* ECF No. 427, at p. 11. These cases, however, only play a small part in my opinion on time and labor as they impact the reasonableness of rates—for the obvious reason that each case can have its own procedural peculiarities and necessities, but they inform my opinion generally on how many hours it can take to win an employment case. And there is a relationship between hours and rate that informs my opinion on the reasonableness of a rate: Consider a team of lawyers who can perform in about 2,000 hours what it might take another team of lawyers over 5,000 hours to perform. The prevailing market rates in the relevant community are higher for that first team. Those kinds of quality-based efficiencies in use of time and labor inform my opinion concerning the reasonableness of hourly rates.

17.    **I understand that Edith Thomas is seeking to recover for under 500 hours of work in the *EEOC v. SkyWest* case—in my opinion, this shows quality-based efficiency in use of time.** In my opinion, serving as counsel for an intervenor in a case the government is prosecuting requires a lot of work. Even when and if the government is

taking the lead in prosecution or trial. Because the government does not represent the individual. And its goals, while they may sometimes be aligned with the individual, are not necessarily the same as the individual's goals in civil litigation. I have experience representing an individual intervenor in a case the EEOC is prosecuting. My understanding is the EEOC's goal is broadly focused on prevention of unlawful employment discrimination and advancing equal opportunities for all in the workplace. But an individual intervenor's goal may be more targeted to the individual intervenor's recovery for harm caused to them specifically. While these separate goals are not mutually exclusive, they can be different. In practice, this can mean that for any particular action of the EEOC in a given case the individual intervenor's attorney may need to be involved. Either in performance of those tasks, performing additional tasks, or considering the impact of the EEOC's tasks on the intervenor's targeted goals and adjusting strategy and tasks accordingly. This can play out in broad decisions about how to prosecute a case generally, to specific conflicts in how to craft the proposed jury charge to take advantage of developments in law. All this informs, in part, my opinion concerning how the time and labor of the individual intervenor's attorney impacts the reasonableness of her hourly rate.

18.     **I understand the defense in the *EEOC v. SkyWest* case was particularly aggressive—especially given the statutory caps involved on recovery**. As with other types of complex civil litigation, the time and labor involved in prosecution can be dictated by the defense. For example, whether a defendant asserts only one affirmative defense or a dozen affirmative defenses can impact the time and labor needed to consider and develop responses to those defenses—via discovery or otherwise. My understanding is that defendant in the *EEOC v. SkyWest* case asserted about 9 matters that defendant claimed were an "an avoidance or affirmative defense" to the intervenor individual's claims. Some with multiple counterparts, like asserting that claims "are barred by the equitable doctrines of latches, waiver, estoppel and/or unclean hands." Defendant represented to the Court that the claims were "frivolous and groundless." And without identifying them in their answer, defendant claimed that her complaint "makes numerous blatantly false claims." And defendant was itself seeking attorneys' fees. I understand that defense insisted on an "independent" medical examination of the intervenor individual, which took a full day. In my experience, independent medical exams are not the norm in employment cases, and most employers take only one or two depositions. It is my understanding that, not including expert depositions, defendant in this case took ten depositions —a strategy that could cause an intervenor's attorney to have to take or be present for numerous depositions. Further, defendant moved for summary judgment on the entire case, which requires counsel for intervenor to at a minimum, help prepare a written explanation of evidence showing there are material and disputed issues of fact for trial. Defendant could have instead just proceeded to trial itself and present the case orally. My understanding is that defense took a particularly long time at trial cross-examining the intervenor at trial. All this

aggressiveness informs, in part, my opinion concerning how the time and labor of the individual intervenor's attorney impacts the reasonableness of her hourly rate.

**Novelty and Difficulty of Issues**

19.    **I am familiar with the novelty and difficulty of issues involved in employment litigation—in my opinion, employment discrimination litigation is difficult**. In *Rush Truck Centers, L.P.* v. *Fitzgerald*, No. DC-09-19598-D (95th District Court for Dallas County, Texas March 2, 2012), former Dallas County District Judge Ken Molberg (now a Dallas Court of Appeals Justice) compared commercial cases with employment cases: "[I]n this Court's experience and observation, it is more difficult to prevail in an employment case than it is in any given commercial or business case." I share that opinion. Often the attorney in an employment case must build a case based on circumstantial evidence rather than direct evidence. The current or former employer usually has greater access to, and control over, the evidence. It may employ many of the witnesses. It may try to justify an employment decision after the decision has been made and may assert multiple reasons for each such decision. In doing so, it may go back into the employment relationship to dredge for dirt on the employee plaintiff. It may change its story during litigation. Employment cases involve a lot of unique doctrines.

20.    **I have experience concerning comparative difficulties in complex commercial litigation versus employment discrimination litigation—employment discrimination cases can be more difficult**. In my experience, outlined herein, employment discrimination litigation can be just as challenging and difficult as complex commercial litigation and other kinds of complex federal litigation. Often it is more so. Part III of The Manual for Complex Litigation published by the Federal Judicial Center limits itself to discussion of six "Particular Types of Litigation": Antitrust, Securities, Employment Discrimination, Intellectual Property, CERCLA, and Civil RICO. In my opinion, the topic of employment discrimination is appropriately included and described alongside these other areas as complex litigation. Employment discrimination litigation often presents difficulties that are not present in commercial litigation and other complex federal litigation. For example, often the attorney prosecuting violation of an employment law must prove intent—what a person was thinking at a particular point in time (sometimes years before). Often that attorney must build a case based on circumstantial evidence rather than direct evidence. Often, much of that evidence is exclusively in the possession or custody of the opposing party—the employing entity. As the employing entity being prosecuted, that opposing party often has a clear incentive to refrain from producing that evidence via any lawful means available to it, and skilled litigators might find many. Often, many or most of the witnesses whose testimony may be needed to build a case are on the payroll of the employing entity. The numerous legal doctrines at issue in employment law—such as same-actor inferences, "cat's paw" analysis, "stray remarks" opinions,

*McDonnell-Douglas* burden-shifting, after-acquired evidence doctrines, and *Faragher/Ellerth* defenses—can be difficult to understand in isolation, hard to analyze in combination, and are frequently undergoing evolution via new precedent and splits in authority. Those circumstances combined can make employment litigation much more difficult than, for example, breach of contract litigation between large companies— involving older legal doctrines the main parameters of which were largely settled over a century ago. They can also make prosecution of employment litigation more difficult than other complex litigation such as those involving securities, intellectual property, CERCLA, and civil RICO. All this informs, in part, my opinion concerning how the novelty and difficulty of employment discrimination litigation generally impacts the reasonableness of the intervenor attorney's hourly rate.

21.    **I understand the *EEOC v. SkyWest* case involved doctrines and issues that can be particularly difficult even among employment discrimination cases**. For example, my understanding is that such issues involved not just proof of harassment that occurred years before the jury trial. That alone can involve difficult *he-said / she-said* evidence and presentation in a way that is persuasive that harassment happened. But the case also involved issues like whether the defendant entity had actual or constructive notice of it— and if so, when. And evaluation and presentation of proof of what a defendant did about it [i.e., whether it took remedial action, what remedial action, when it did so, and whether that action was prompt or effective]. My understanding is that the Court in the *EEOC v. SkyWest* case issued a 23-page opinion on the case on a number of these issues. I.e., whether minimally sufficient evidence exists for trial. But trial itself can involve more than just marshalling minimally sufficient proof of those issues—it involves presenting it in such a way that a jury is convinced. Doing so can be difficult because it can mean overcoming existing or perceived juror biases about the issues involved in sexual harassment cases generally. Such biases may not exist in commercial or intellectual property litigation or wrongful death cases. Where jurors may more overwhelmingly agree that wrongful death should be illegal. Or that companies should abide by their written agreements. Or should not steal intellectual property. But there can be more difficult and nuanced issues involved when it comes to sexual harassment in the workplace. For example, some survey results suggest that "27% of men say that harassment is decreasing. And 50% of men say that the consequences are more damaging to the careers of harassers, not victims." https://leanin.org/sexual-harassment-backlash-survey-results#! Plus, there is a documented backlash to the #metoo movement in recent years: https://hbr.org/2019/09/the-metoo-backlash. Whether true or not, even the existence of these perceptions can make presentation of a sexual harassment case more difficult than [for example] a commercial or intellectual property case. Because of the socially and culturally sensitive and rapidly evolving issues involved. All this informs, in part, my opinion concerning how the novelty and difficulty of presenting the sexual harassment

issues in the *EEOC v. SkyWest* case impacts the reasonableness of the intervenor attorney's hourly rate.

**Skill Required**

22.      **I am familiar with the relatively greater skill required to successfully prosecute civil litigation generally—as compared to performing other types of legal services [like transactional work].** A lawyer hoping to prosecute litigation can have numerous obstacles that take skill to overcome. Some are just inherent in civil litigation work generally compared with other kinds of legal services. For example: managing the amount of work itself. Legal services like negotiating a settlement agreement can involve a relatively fixed and lesser amount of time and a more limited number of tasks. Litigation and trial work generally can require skill in managing hundreds or thousands of hours of work and dozens of tasks—each with some potential impact on others. Some of those tasks can be dictated by others, like courts or opposing counsel. I sometimes analogize to what I imagine it might be like steering a cruise ship with a paddle—hard to keep direction controlled. Another example: facing skilled opponents. That is, well-educated, trained, and sometimes more-experienced, lawyers who are dedicating and focusing their skills and time to opposing what you are doing. Where lawyers in a corporate merger may ultimately be trying to come to a mutually agreeable deal, lawyers in litigation usually are not. Some obstacles can be more particular to plaintiff-side work—like bearing the burden of proving liability. I analogize the difference in *prosecuting* a civil case and *defending* one (I have done both in my career) to the difference in building a house versus tearing one down: Creating is harder than destroying.[1]

23.      **I am familiar with the relatively greater skill required to successfully prosecute employment discrimination litigation—as compared to other types of complex litigation.** Some obstacles in civil litigation can be more particular to employment litigation. For example, disparity in resources with which to litigate—caused in part by the defending employer:  the David v. Goliath obstacle. When one large company is suing another large company over an intellectual property dispute, for example, there may also be disparity. Though often both may be able to afford teams of lawyers from enormous law firms. Still, one company may have more resources than the other. But a working person's wages are often that person's only or main source of revenue. When an employer cuts off or limits those wages, the employer cuts off disposable resources with which to invest in prosecuting litigation. Employment litigation usually involves an individual who is wholly or mostly dependent on employment for income trying to prosecute an entity with at least sufficient wealth enough to employ individuals. As a practical matter, for a lawyer, this can mean that the litigation will have to proceed without certain resources a lawyer might like

---

[1] Famous Texan and former Speaker of the United States House of Representatives Sam Rayburn is reported to have stated a similar analogy — less delicately but more colorfully: "Any jackass can kick down a barn, but it takes a carpenter to build one."

to have in litigation and might have in other kinds of litigation: resources like consulting or testifying experts, private investigators, live video-depositions with trained videographers, depositions of persons or entities far-outside the geographic area of the litigation, and litigation support services such as IT personnel and technology support staff. Otherwise, it can mean the prosecuting lawyers will have to risk paying those expenses themselves— with only a hope of recovering those costs, some of which may not be recoverable at all under the applicable cost-recovery rules or statutes. In my experience, few working people can afford to pay a lawyer a full market hourly rate secured with a retainer to fully prosecute an employment claim all the way through trial. So, the only real access to the courthouse for those employees depends on finding a lawyer willing to represent him on a contingency arrangement—meaning the lawyer will only be fully paid *contingent* on the lawyer winning or successfully negotiating a settlement. In my experience (outlined herein) many law firms with entire staffs of lawyers who spend their careers focusing on employment law simply will not represent clients on that kind of risk of non-payment. Or if they did so, they would charge a premium above-and-beyond their usual secured-with-a-retainer hourly rates. To modify the age-old colloquialism / idiom about "not suffering fools," a plaintiff's employment law practice will not often or long suffer unskilled attorneys. And it takes a very skilled lawyer to be able to work without access to resources of a big company or a nation-wide law firm. There can also be a discovery-access problem: there is usually an access obstacle—with the employer controlling needed documents and employing many or most of the main witnesses to the questions of liability. Even just getting beyond motions for summary judgment in modern employment discrimination practice can require a lot of skill. Just look at some of the numbers. For example, a Federal Judicial Center study apparently analyzed 179,969 cases in 2006. Of those, summary judgment was granted [entirely or in part] in about 77% of employment discrimination cases. Compared to about 61%        in        tort        cases        and        59%        in        contract        cases. https://www.uscourts.gov/sites/default/files/sujulrs2.pdf The reason for this disparity is debated among those who study and comment on it. One federal judge has noted that scholars and practitioners hypothesize that "summary judgment is being unfairly granted in employment discrimination cases because federal judges are hostile to these cases; [or] federal judges are trying to drive plaintiffs in employment cases to state court." Hon. Denny Chin, *Summary Judgment in Employment Discrimination Cases: A Judge's Perspective*, 57 N.Y.L. SCH. L. REV. 671, 672 (2013). But regardless of the reason, the underlying statistics show it takes a lot of developed skill to overcome these obstacles. All this informs, in part, my opinion concerning the reasonableness of the intervenor attorney's hourly rate in the *EEOC V. SKYWEST* case.

### Loss of Other Employment in Taking the Case

24.    **I am familiar with the likelihood that acceptance of work prosecuting an employment case can preclude acceptance of other work.** In my experience, the field of

worker-side employment law in Texas is underserved—there are *way* more Texans who need an employment lawyer willing to help them than there are lawyers willing to dedicate their practice of law to representing workers in employment matters. In my opinion, it is likely why there are numerous billboards on the sides of roads in Texas advertising for truck wreck lawyers. But it is rare to see any advertising about representation in worker-side employment cases: It is not a competitive field because of the vast numbers of people who need such representation and the relatively few lawyers in this field of legal practice. It is also my experience that most lawyers who represent workers in employment matters in Texas do so in small or solo firms. Which means that taking on any one case can mean turning down others. I am also familiar with how some big multi-city law firms operate—with lots of staff and numerous associated attorneys with only 1 to 5 years of experience. These are law firms that have such high numbers of personnel that taking any one case is not likely to preclude it from accepting any other legal matter because the law firm can easily add or adjust staffing ratios. While this may be common in other areas of practice, in my experience it is not common in worker-side employment law. What is more common is that accepting the obligation of legal representation in any one case necessarily means declining it in numerous others. All this informs, in part, my opinion concerning the reasonableness of the intervenor attorney's hourly rate in the *EEOC v. SKYWEST* case.

### Customary Fees and Awards in Similar Cases

25.    **I am familiar with hourly fee rates that lawyers who bill by the hour charge for employment law work in Texas—as well as rates federal and state court judges have awarded in Texas for employment law work.** I have researched and led research concerning hourly fee rates that federal and state court judges have awarded in employment cases in Texas over the past several years and concerning what lawyers who practice employment law in Texas bill to clients (and receive from clients) as hourly rates—when they have clients who can pay by the hour. Results of such work are contained in a 2023 Attorneys' Fees Hourly Rate Yearbook for Labor and Employment Law that is published via the Texas Employment Lawyers Association. It is attached. This is a compilation of attorneys' hourly rates for employment law work in Texas. It uses court rulings, jury verdicts, arbitrations, testimony, and actual rates billed. Unlike summaries of anonymous surveys, it names lawyers and cites sources. To help compare quantity of experience, it is grouped by ten-year classes—like a yearbook groups classes from seniors to freshmen. It is organized by geographic regions corresponding with the four federal districts in Texas and accounts for inflation to the end of 2022 via the U.S. Bureau of Labor Statistics for legal services. This compilation is limited to labor and employment law work—about 350 lawyers and over 100 fee awards. This research and book, in part, informs my opinions expressed herein concerning current market rates for worker-side attorneys who prevail in prosecuting employment cases in Texas and, more specifically, in the Dallas area. I note, however, that the book is a little outdated now in 2024 when it comes to inflation: Because

the 2023 Yearbook adjusted older rates for inflation up to the end of 2022. But according to recent inflation data from the U.S. Bureau of Labor Statistics, prices for legal services are 6.23% higher in 2023 versus 2022, and the rates listed in the 2023 Yearbook have not been adjusted up for such inflation through the end of 2023. It also does not account for more modern cases—rates found since publication. All this specifically informs my opinion concerning fair and reasonable hourly rates for legal services of Edith Thomas, whose professional biography I have read and whose skills, abilities, and reputation with which I have familiarity. As I helped create and assemble this 2023 Yearbook referenced, I have also read the biographies of each lawyer listed in it. And so, I have some familiarity with the comparative published qualities of experiences of all these lawyers. All this informs, in part, my opinion concerning the reasonableness of the intervenor attorney's hourly rate in the *EEOC V. SKYWEST* case. And it plays a larger role than other factors, given the overall directive in *Blum v. Stenson*, 465 U.S. 886 (1984), to find or use the "prevailing market rates in the relevant community." In my opinion, no greater factor helps show such "prevailing market rates" than those either actually charged or actually awarded for labor and employment law work in Texas—or, more specifically, in Dallas or the geographic region for the United States District Court for the Northern District of Texas.

## Results Obtained

26.     **I am familiar with the results obtained in the *EEOC V. SKYWEST* case: The results are excellent.** The intervenor prevailed at a jury trial. And monetarily, she helped prove (and the jury found) more in damage than the statutory caps permitted to be recovered. It made national news. These results inform my opinion about how well this case was prepared and tried and so, on the rates of intervenor's attorney in performing work toward those results in the *EEOC V. SKYWEST* case.

## Counsel's Experience, Reputation, and Ability

27.     **In my opinion, Edith Thomas is an excellent lawyer.** I am familiar with attorney Edith Thomas, her experience, reputation, and ability. I have known her since about 2008, when she joined the Texas Employment Lawyers Association of which I was (and remain) a member. Since then, we have collaborated and discussed employment law—and on ways of presenting such cases to a jury and preparing to do so. I am familiar with her work history, particularly with some of the better-known worker-side employment-focused law firms in the Dallas-Fort Worth area. For example, she associated with Gillespie, Rozen, & Watsky P.C. (in Dallas) and also Rod Tanner (in Fort Worth), both of which have a reputation for excellence in this field of legal practice. This background seems particularly good experience and training in this field of legal practice. I understand that Edith Thomas graduated law school 2004 and has been focused on worker-side employment law since

around at least 2008. All this informs, in part, my opinion concerning the reasonableness of the intervenor attorney's hourly rate in the *EEOC v. SKYWEST* case.

### Case Undesirability

28.    **In my opinion, acting as independent counsel for an intervenor in a case the EEOC is prosecuting can be undesirable work for a private attorney—because of the fear of how judges might treat the fee application of the intervenor's attorney.** As a practical matter, representing an intervenor where the EEOC is prosecuting a case through trial has this difficulty: The EEOC may not do all the driving, so to speak. In addition, defendants can and do issue discovery directly to the intervenor, and intervenor counsel is usually the primary point of contact for the intervenor/charging party.   This can mean communicating with intervenor about discovery, case status, deadlines, settlement – in other words, all aspects of litigation. When the EEOC attorneys are driving, minimal due diligence (besides doing a good job) means vigilance in oversight of how they are doing so—because of differing goals referenced above. All this means performing work that is necessary to doing a good job in representation, but that a judge may decide should not be paid by the law-breaking company. Because of some perception of (rather than actual) duplication or lack of necessity. So, unless the intervenor can afford to pay (and does pay) an hourly rate for such work, the work can be undesirable because it can mean a risk of working without full and fair compensation for work actually being performed.

29.    **In my opinion, civil rights work generally—and employment discrimination cases specifically—can be undesirable for lawyers because of the fear of how judges (who decide fees) might view requests for fees in such cases.** In assessing whether they might be paid fairly, if they prevail, lawyers may believe they have to overcome some stereotypes about getting fair compensation in civil rights matters. As General Counsel of the United States Department of Health and Human Services and former Law Professor Samuel R. Bagenstos of the University of Michigan Law School puts it:

> We currently have a system of civil rights enforcement that harnesses the profit motive of plaintiffs' attorneys to encourage the prosecution of violations of civil rights laws. *That system may seem crass and disreputable to those who believe that lawyers should bring civil rights actions out of the goodness of their hearts* (perhaps while singing 'Kumbaya' or, for those of a more lefty persuasion, 'If I Had a Hammer').

Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 NW U. L. REV. COLLOQUY 182, 182 (2007) (emphasis added). Professor Bagenstos is not alone. He summarizes and quotes former Dean and Professor Emeritus of the University of San Francisco School of Law—who performed an analysis of fee opinions in civil rights cases:

> The biggest obstacle to that system is the view, widespread among federal judges, that civil rights litigation 'is not part and parcel of ordinary practice, but is more in the nature of charity or volunteer work.'

*Id.* at p. 187 (quoting Jeffrey S. Brand, *The Second Front in the Fight for Civil Rights: The Supreme Court, Congress, and Statutory Fees*, 69 TEX. L. REV. 291, 373 (1990)). Whether any of this is *actually* true or not—that those who decide fees have this expressly-held or subconscious bias—is beside the point. Whether that belief is real or not, in-play or not, the mere *prospect* of its existence can have real-world impact on desirability: Given the existence of such scholarship and conclusions of those who study the area, a lawyer might refrain from taking the gamble that seeking money for enforcing civil rights laws will be seen (expressly or subconsciously) as crass. Or that seeking fees for such work will be viewed with some amount of disfavor. Or that civil rights work may ultimately be seen as not as deserving of fees as say, business disputes or copyright or intellectual property work—because such civil rights by private attorneys should be done pro bono, out of charity, etc. And may, therefore, garner less compensation.

30.    **In my opinion, civil rights work generally—and employment discrimination cases specifically—can be undesirable for lawyers because of the fear of how judges (who decide fees) might set rates.** In my opinion, a disincentive for taking these cases can be the *belief* that judges will only provide compensation at or below the same rates defense lawyers can make win or lose—as Professor Bagenstos explains:

> Because plaintiffs' counsel in fee-shifting cases get paid only if they win, paying them the same hourly rate as lawyers who get paid whether they win or lose creates a disincentive to take these cases.

*Id.* at p. 185. So, a lawyer faced with the prospect of *only* earning (at most) at the *same* rate as lawyers who are paid win or lose—can make these cases undesirable.

31.    **In my opinion, civil rights work generally—and employment discrimination cases specifically—can be undesirable for lawyers because of some practical problems in trying discrimination issues to a jury.** Aside from the complexity of the law itself, there can be practical problems that make such cases difficult: Many people, many prospective jurors, may have express or subconscious biases *favoring* the very kind of discrimination at issue in an employment discrimination case. That is, many people may hold the belief that employers being free to discriminate—on the bases of various protected categories—is a *good* thing. At inception, civil rights laws themselves *prohibiting* employment discrimination were not overwhelmingly popular. I understand the United States House of Representatives passed the Civil Rights of 1964 on February 10, 1964, and after a 54-day filibuster, it

passed the United States Senate on June 19, 1964. The final vote was 290–130 in the House of Representatives and 73–27 in the Senate. In contrast, making acts like murder a crime—or creating civil liability for breach of contract or fraud—seems near universally popular. Many people (prospective jurors) may hold beliefs that employers *should* be able to discriminate on the basis of sex or race or one of the other now-protected classes. After all, Jim Crow laws—as odious as they were—did not exist because they were so nationally condemned and extremely unpopular. Same with the discrimination inherent in school segregation: It was not undone via popular mandate but as a result of cases like *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954). Skipping forward to more modern times, at least some of that opinion favoring discrimination—or at least disfavoring making it illegal—still exists. For example, in forming my opinion on this aspect of undesirability, I have considered this result of polling by the Kaiser Family Foundation (KFF) of 1,001 people:



Figure 4

A Majority Of The Public Support Non-Discrimination Laws

In general, do you support or oppose laws that **ban discrimination** based on…?

76% support
Whether a person has a disability

71% support
Race or ethnicity

69% support
Whether a person is lesbian, gay, or bisexual

68% support
Whether a person is transgender

SOURCE: KFF Poll: LGBTQ Rights And Health Care (conducted June 16-21, 2020). See topline for full question wording.

KFF
KAISER FAMILY FOUNDATION

While the set of people opposing laws on discrimination is a minority, it is a significant one—hovering between 20% and 30%, according to this poll. I have also considered this similar result of polling by market research company YouGov PLC, in which 1,000 adults in the United States were reportedly asked whether sex discrimination in employment should be unlawful at all:



So, of 1,000 polled, fully 19% were either unsure (10%) or that it *should* be legal to discriminate on the basis of sex (9%). Views disfavoring laws banning discrimination—are unfortunate. But those views are a reality. Or at least a perceived reality. If accurate, they can make trying and prevailing before a jury in civil rights discrimination cases difficult. Even if inaccurate, the fact that such data exists can discourage lawyers from taking such cases. Having a large (though minority) segment of the population who even *might* believe discrimination *should* be legal is a real disincentive from taking such cases. Because prevailing may be a prerequisite to recovering payment for work actually performed, the existence of these beliefs—or at least the *perception* that these beliefs *may* exist among the general population—can, in my opinion, make such cases undesirable for lawyers.

32.    **I am familiar with how the economic amounts involved in labor and employment cases can shrink the available market for counsel who are well-qualified**

**to successfully try such cases.** Labor and employment law claims can lack remedies other laws provide—like trebling of damages under deceptive trade practice laws or, sometimes, involve caps on compensatory or punitive or exemplary damages. Some damages caps, like those under Title VII of the Civil Rights Act of 1964, have been in place for decades and without adjustment for inflation may apply. For example, the $300k damages cap under Title VII was put in place in 1991 and has not changed since:



Due to inflation, the spending power of that $300k cap in 2023 dollars is apparently only worth $133,083.19. So, the financial incentive for taking such cases is diminished (and diminishing) as the years pass. For these reasons, these cases can be undesirable to lawyers who can try cases—lawyers who have skills enough to not only file cases and go through procedures and discovery (i.e., "litigators") but also carry cases all the way through a trial (i.e., "trial lawyers"). Lawyers with sufficient skill to try and win complex litigation could choose to limit their practice to only representing high-income earners whose economic losses are large. Or companies in commercial disputes. So, the market for such worker-side lawyers who will represent workers with relatively low or no economic losses can be smaller than other markets for legal services provided on a contingency fee basis. This can put lawyers who will try such cases in high demand. Consequently, it bears on what a market

hourly rate might be when engaging in the hypothetical lodestar question under *Perdue*—
what the prevailing attorney "would have received *if* he or she had been representing a
paying client who has billed by the hour in a comparable case."

33.    **In my opinion, civil rights work generally—and labor and employment cases
specifically—can be undesirable for lawyers because of their complexity.** In my
opinion, there is a shortage of lawyers in Texas who are willing to take such cases for
workers compared to how many workers need help. On a given weekday, I may get three to
five calls from potential clients—workers who need help in an employment matter, and I
do not even have a firm website for marketing. In my experience, workers may have to try
dozens of lawyers before finding one willing to help. In my opinion, this is partly *because* of
the undesirability of this kind of work. Because the work is complex. I think it can be easier
for lawyers to make money working on other, less-complex cases.

34.    **In my opinion the difficulties in employment discrimination cases and the
undesirability of those cases *would likely cause lawyers who bill by the hour to charge a
premium market rate for their time if payment depended on prevailing.*** In my experience,
it is uncommon (and virtually unheard of) for lawyers to bill clients by the hour but then
make the duty to pay those hourly fees dependent on a successful outcome of the legal
services provided. In my opinion (based on my experience) it is usual and customary that
lawyers who charge clients by the hour will *not* make payment of those hourly fees
dependent on the success of the representation or risk of loss. In fact, it is usual and
customary for such lawyers to *require* retainers as security for payment of those hourly
fees—to assure timely payment of hourly fees *regardless* of the success of the legal services
or risk of loss. In my opinion (based on my experience), the only usual and customary
exception to this practice is a long-standing relationship with that client showing a history
of timely payment of legal services bills, regardless of the success of the legal services or
risk of loss or risk of not being paid, without a retainer. It is also my opinion (based on my
experience and simple economic considerations and common sense) that a lawyer who
usually bills by the hour would charge a *higher* hourly rate if asked to take the risk of having
any payment of those hourly bills wholly dependent on winning. I analogize it to a trapeze
artist: the artist may have an hourly rate to perform but might increase his rate to perform
without a net. So, a lawyer who charges $750 per hour based on his skill, experience, and
expertise in an area of law—but who is unwilling to make payment dependent on success
at that price—might charge more to take the risk of making payment of those hourly fees
dependent on success. It is also my opinion, based on the same reasons, that the rise in
hourly rate would likely bear some relation to the number of hours risked—risking non-
payment for one hour of work is, of course, not as big a risk as risking non-payment for ten
hours of work. So, the time involved in prosecuting a lawsuit in which payment may never
result (or may result in payment but only years later) might cause that lawyer to charge

even more because of the risk of non-payment or delayed payment. I analogize to this hypothetical negotiation between a developer and a plumber:

> Developer: I would like you to perform some plumbing work in a new neighborhood of houses I am building.

> Plumber: Great! My rate is $60 per hour.

> Developer: I can only pay if I sell the houses—so if I do not sell, I cannot and will not pay.

> Plumber: Fine, but my rate is going to be $90 per hour if I take that risk.

> Developer: There's more. This is not just a one-day job. I am developing 100 houses. So, it is going to take many full months of plumbing work—about 20 hours per house. About 2,000 hours in all. Plus, I need to build and sell all of them before I can pay you. That could take a year or so. Maybe longer. Maybe they will not sell at all. And I cannot give you a retainer.

> Plumber. Ok. But that's a much bigger risk of not being paid at all. I can do it. But my rate is going to be $120 per hour, double my regular rate, if I take that risk—of non-payment and of that big of an investment of hours and over that long of a period.

For lawyers who bill by the hour—win or lose, and with the safety of a retainer—it is my opinion that those lawyers might charge a premium above their *usual* hourly market rates for taking both a risk of loss and risk of non-payment. All this undesirability informs, in part, my opinion concerning the reasonableness of the intervenor attorney's hourly rate in the *EEOC V. SKYWEST* case.

### THE MARKET-BASED HOURLY RATES

35.     **Here is my opinion on the reasonableness of rates of Edith Thomas for her work in the *EEOC V. SKYWEST* case in 2024—if I assume payment were guaranteed and paid periodically**: In my opinion, reasonableness is a range and not a single point. That is, there can be multiple hourly rates for a given attorney for the very same work and that would all be within the "prevailing market rates in the relevant community" as that phrase is used in the often-cited United States Supreme Court fees decision of *Blum v. Stevenson*, 465 U.S. 886 (1984). Based on my experience outlined above and my consideration of the information referenced above, it is my opinion that the following hourly rate referenced below is within the "prevailing market rates in the relevant community" in the year 2024

if payment were *guaranteed* win or lose and *paid monthly or quarterly*. That is, it is within a reasonable range in Texas for work prosecuting an employment case in Texas—within a reasonable range that "roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a *paying* client who has billed by the hour in a comparable case,"[2] but if payment were *guaranteed* win or lose and *paid monthly or quarterly*—in the year 2024:

36.    **For Edith Thomas, who I understand graduated from law school with a Doctor of Jurisprudence degree in 2004 ("JD 2004"), $550 per hour is a reasonable rate (though on the low-end of the range) for her work in the *EEOC v. SkyWest* case.** I base my opinion, in part, on the fact that $550 per hour is lower than the inflation-adjusted hourly rates of the following attorneys with similar or fewer years of experience listed in the 2023 Attorneys' Fees Hourly Rates Yearbook for Labor and Employment Law—for labor or employment law work (described therein) within the geographic scope of the Northern District of Texas:

$1,131.92 Andrew Stauber (JD 2010)

$722.02 Britney J.P. Prince (JD 2015)

$1,105.00 Lindsay F. Ditlow (JD 2006)

$695.00 Christian S. Dennie (JD 2004)

$954.00 Mike Gaddis (JD 2009)

$694.67 Betsey A. Boutelle (JD 2014)

$886.50 Alexandra Aurisch (JD 2014)

$662.11 John Roger Herring (JD 2008)

$875.18 Crystal Jamison Woods (JD 2009)

$652.50 Claire Dial (JD 2019)

$870.00 Cristell Fortune (JD 2018)

$652.50 Dylan French (JD 2019)

$847.83 Allison A. Reddoch (JD 2011)

$650.16 Eric Halpern (JD 2019)

$847.83 Isabel A. Crosby (JD 2005)

$650.16 Ashley Wright (JD 2018)

$809.54 Micala Bernardo (JD 2007)

$633.11 Amanda Jereige (JD 2018)

$762.61 Kate Marcom (JD 2016)

$567.30 Arrissa K. Meyer (JD 2010)

$734.56 Todd Mobley (JD 2010)

$553.96 Brent Walker (JD 2004)

---

[2] *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (emphasis added).

That is only adjusting for inflation through the *end of the year 2022*—not through today. According to recently inflation data from the U.S. Bureau of Labor Statistics, prices for legal services are 6.23% higher in 2023 versus 2022. The rates listed above from the 2023 Yearbook have only been adjusted for inflation through the end of 2022, not 2023 or 2024.

Also, as previously noted, at the time I left Jenkens & Gilchrist, P.C. my regular billable hourly rate was $255 per hour. That was what my law firm regularly charged clients for my legal services (primarily litigation) that I performed in Dallas in 2002—at a time when I was only about six years out of law school. Adjusting for inflation using the consumer price index for legal services generated by the United States Bureau of Labor Statistics, that same rate for a six-year lawyer at the end of 2023 would be $512.15 (prices for legal services were 100.84% higher in 2023 versus 2002, a $257.15 difference in value). So, in part, I also base my opinion that $550 per hour is a reasonable rate for Edith Thomas (who again, is about twenty years out of law school) on this fact too.

37.     **It is my opinion that this rate is *too low* if Edith Thomas also bore the risk of uncertainty of collection—a usual and customary fee for lawyers who were to take that risk and charge by the hour would likely be higher**. Consideration of several factors—like the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the legal service properly, the fee customarily charged *by the hour and with a retainer as security for payment* in the locality for similar legal services, the undesirability of the case, etc.—lead me to my opinion that the above-stated hourly rates are within a reasonable range. But a different set of considerations would lead me to believe that these hourly rates are too low to generate a fee that "roughly approximates the fee that the prevailing attorney would have received *if* he or she had been representing a paying client who has billed by the hour in a comparable case" within the meaning of the United States Supreme Court in the *Perdue* case and the Supreme Court of Texas in the *Rohrmoos* case. Those considerations are whether the fee is contingent on results obtained, uncertainty of collection before the legal services have been rendered, and a customary hourly fee for lawyers who take that risk of non-collection and non-payment. That is, in my opinion this same cited rate would be inordinately low for lawyers with the same training, education, experience, reputation, skill, and ability who regularly bill by the hour for labor and employment law work in Texas—but were to agree to take the added risk of (1) non-payment of their hourly fees should the lawyer not prevail, (2) the investment of hundreds of hours of work on that risk, and (3) extension of that risk over the time it can take from filing the complaint to settlement near trial or through trial or appeal itself. That is, the above-referenced rate for Edith Thomas is, in my opinion, within a reasonable range for lawyers with similar training, education, experience, reputation, skill, and ability who get paid by the hour for employment law work in Texas and take *no risk* of non-payment or years-delayed payment with an investment of hundreds of hours of time. And given the comparative rates cited above, it is on the low end of that range.

**SIGNATURE**

38.     There are my opinions. My name is David L. Wiley. I am former Chair and former Chair Emeritus of the State Bar of Texas Labor and Employment Law Section. I am former President of the Texas Employment Lawyers Association. I have neither been paid nor promised payment for my opinions expressed herein. My date of birth is January 14, 1969, and my address is 1500 Jackson Street, #109, Dallas, TX 75201-4923. My office telephone number is (214) 522-2121 and my mobile telephone number is (214) 336-4276. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of December 2024,

*David L. Wiley*

_____
David L. Wiley

# 2023

**Attorneys' Fees Hourly Rates**

**Labor and Employment Law**



*Yearbook*

Published by the Texas Employment Lawyers Association

word searchable .pdf here: mytela.org/feeyearbook

# 2023 | Attorneys' Fees Hourly Rates

This collection is drawn from court rulings, jury verdicts, arbitrations, and actual rates billed. Unlike summaries of anonymous surveys, it names the lawyers and cites sources. To compare quantity of experience, it is grouped by ten-year classes—like a yearbook groups classes from seniors to freshmen. It is organized by geographic regions corresponding with the four federal districts in Texas. It accounts for inflation to the end of 2022 via the U.S. Bureau of Labor Statistics' data for legal services. It is limited to labor and employment law work in Texas.

Yearbook

# *Demographics*



# 108,816*

## Texas lawyers

Most are in the Houston and Dallas metropolitan statistical areas—31.98% in the Houston–The Woodlands–Sugar Land MSA and 30.89% in the Dallas–Fort Worth–Arlington MSA.

# 3,218

## Members of the SBOT
## Labor & Employment Law Section

# 666

## Board-certified L&E Specialists

**\* Sources:**

State Bar of Texas Membership: Attorney Statistical Profile (2021-22) and
State Bar of Texas Attorney Population Density by Metropolitan Statistical Area: 2021–2022.

# "Civil rights laws don't enforce themselves."[1]

By design, they rely on private attorneys general to prosecute violations. Fee shifting is a basic part of making federal and state employment laws work.[2] This collection is intended to show "prevailing market rates in the relevant community" within the meaning of *Blum v. Stenson*, 465 U.S. 886 (1984). The focus here is Texas.

# "Reasonableness is a range, not a point."[3]

The idea is to light the edges, to mark the averages and medians. Collecting labor and employment law rates here reveals the "customary fee for similar work in the community" and "awards in similar cases."[4] The idea is to help gauge reasonableness.

---

[1] Samuel R. Bagenstos, *Mandatory Pro Bono and Private Attorneys General*, 101 Nw. U. L. Rev. Colloquy 182, 183 (2007).

[2] *See id.* at 187 ("Because the private attorney general system is essential to civil rights enforcement, and fee shifting is the engine that drives the system, judicial rulings regarding the availability of statutory attorneys' fees are likely to have extremely significant effects on the vindication of civil rights in practice.").

The legislative history of the Civil Rights Attorney's Fees Awards Act of 1976 has a robust discussion of the private attorneys' general concept, and a compilation of that history is here: https://ufdc.ufl.edu/AA00026686/00001/1.

[3] *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005) (Judge Posner addressing sentencing ranges).

[4] *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718-19 (5th Cir. 1974) (listing guidelines which include "[t]he customary fee for similar work in the community" and "[a]wards in similar cases"); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) ("Factors that a factfinder should consider when determining the reasonableness of a fee include . . . the fee customarily charged in the locality for similar legal services") (omission added).

# Inflation

## "Legal services priced at $200 in 1990 → $651.15 in 2022"

"According to the U.S. Bureau of Labor Statistics, prices for legal services were **225.58%** higher in **2022** versus **1990** (a $410.93 difference in value)."

"**Between 1990 and 2022:** Legal services experienced an average inflation rate of 3.76% per year. This rate of change indicates significant inflation. In other words, legal services costing $200 in the year 1990 would cost $651.15 in 2022 for an equivalent purchase. Compared to the overall inflation rate of 2.55% annually during this same period, inflation for legal services was higher."

Source:

https://www.officialdata.org/Legal-services/price-inflation/1990-to-2022?amount=200

# Inflation + Experience



How *inflation* changes the price of legal services.

| 1990 | 2000 | 2010 | 2022 |
|------|------|------|------|
| $ 200.00 | $ 308.97 | $ 470.18 | $ 651.15 |

"But the passage of time not only triggers inflation adjustments, it represents additional time in which the attorney has gained more experience and skill, justifying higher rates."

— **Judge Nelva Gonzales Ramos**



How *more experience and skill* changes the price of legal services.

Both inflation and more experience and skill are relevant—this book *only* adjusts older rates for inflation.



$???.??/hr



*North Texas*



NDTX† summary of rates listed for
labor and employment law work:

# 104 lawyers: $1,414.90 to $262.46

| Rate | Name / JD Year | Rate | Name / JD Year |
|------|----------------|------|----------------|
| $1,414.90* | Amy A. Null (JD 1991) | $595.11* | Trey Branham (JD 1999) |
| $1,413.89* | Shane M. Tucker (JD 1999) | $595.11* | Jeffrey Goldbarb (JD 1994) |
| $1,230.00* | Laura Petroff (JD 1980) | $591.71* | Joseph H. Gillespie (JD 2002) |
| $1,210.50* | Steven Stodghill (JD 1987) | $590.53* | Robert G. "Bobby" Lee (JD 1993) |
| $1,189.48 | Laura E. Schneider (JD 1992) | $586.21* | Kyla Cole (JD 2001) |
| $1,157.95* | John E. Fitzsimmons (JD 1995) | $570.22* | Michael A. McCabe (JD 1998) |
| $1,131.92* | Andrew Stauber (JD 2010) | $570.22* | David L. Wiley (JD 1996) |
| $1,125.49* | Cathryn Le Regulski (JD 1999) | $570.22* | Amy E. Gibson (JD 1995) |
| $1,105.00* | Lindsay F. Ditlow (JD 2006) | $567.30* | Arrissa K. Meyer (JD 2010) |
| $1,082.20* | Rogge Dunn (JD 1983) | $553.96* | Brent Walker (JD 2004) |
| $1,057.50* | Geoffrey Harper (JD 1995) | $546.99* | Jason Smith (JD 1992) |
| $1,055.18* | Patrick S. Casey (JD 1984) | $541.42* | Howard L. Steele, Jr. (JD 1996) |
| $1,039.50* | Thomas Walsh (JD 1992) | $540.00* | Andrew M. Gould (JD 1994) |
| $1,038.67* | Charla Aldous (JD 1985) | $538.93* | Peter A. Milianti (JD 1997) |
| $954.00* | Mike Gaddis (JD 2009) | $530.58* | Breegan Mayrant (JD 2017) |
| $938.91* | Marc D. Katz (JD 1994) | $525.00* | Douglas B. Welmaker (JD 1993) |
| $900.72* | Hal K. Gillespie (JD 1972) | $520.00* | Christopher Collins (JD 1999) |
| $895.50* | Cardelle Spangler (JD 1997) | $514.80* | Kimberly Williams (JD 2005) |
| $886.50* | Alexandra Aurisch (JD 2014) | $512.99* | Jordan Campbell (JD 2013) |
| $878.91* | Susan Hutchison (JD 1987) | $503.08* | Daniel E. Farrington (JD 1998) |
| $875.18* | Crystal Jamison Woods (JD 2009) | $493.30* | Brandon Shelby (JD 2004) |
| $872.04* | Joel M. Fineberg (JD 1991) | $493.30* | David Langenfeld (JD 1992) |
| $870.00* | Cristell Fortune (JD 2018) | $493.09* | James D. Sanford (JD 2005) |
| $864.92* | Norlynn B. Price (JD 1984) | $492.29* | Ashley Tremain (JD 2008) |
| $863.28* | Russell W. Budd (JD 1979) | $492.29* | Carmen Artaza (JD 2006) |
| $854.69* | Matthew R. Scott (JD 1995) | $492.29* | Christine Hopkins (JD 2005) |
| $847.83* | Allison A. Reddoch (JD 2011) | $486.99* | John M. Barcus (JD 2002) |
| $847.83* | Isabel A. Crosby (JD 2005) | $483.00* | Kimberly Williams (JD 2005) |
| $809.54* | Micala Bernardo (JD 2007) | $473.37* | M. Jeanette Fedele (JD 2003) |
| $809.54* | Michael W. Massiatte (JD 2000) | $470.00* | Molly Jones (JD 2009) |
| $804.96* | Stuart L. Cochran (JD 2000) | $464.94* | Gavin S. Martinson (JD 2005) |
| $801.62* | Brian P. Sanford (JD 1986) | $456.30* | Monica Velazquez (JD 2002) |
| $781.41* | Danielle Alexis Matthews (JD 2000) | $450.00* | Paul Vitanza (JD 2000) |
| $762.61* | Kate Marcom (JD 2016) | $441.84* | David Norris (JD 2011) |
| $734.56* | Todd Mobley (JD 2010) | $438.50* | Corinna Chandler (JD 2009) |
| $722.02* | Britney J. P. Prince (JD 2015) | $438.50* | Todd Goldberg (JD 2009) |
| $696.79* | Karen C. Denney (JD 2002) | $438.50* | Jamie Gilmore (JD 2006) |
| $695.00* | Christian S. Dennie (JD 2004) | $437.59* | Jay Forester (JD 2013) |
| $694.67* | Betsey A. Boutelle (JD 2014) | $409.28* | Theanna Bezney (JD 2015) |
| $692.45* | Brian Lauten (JD 2001) | $400.00* | Elizabeth Sanford (JD 2017) |
| $670.80* | Richard E. Norman (JD 1993) | $382.89* | Jeff T. Leslie (JD 2015) |
| $662.11* | John Roger Herring (JD 2008) | $382.31* | Barrett Robin (JD 2015) |



NDTX† summary of rates listed for
labor and employment law work:

# 104 lawyers: $1,414.90 to $262.46

| | | | |
|---|---|---|---|
| $652.50* | Claire Dial (JD 2019) | $365.00* | Dana Hilzendager (JD 2017) |
| $652.50* | Dylan French (JD 2019) | $351.93* | Megan Dixon (JD 2012) |
| $650.16* | Eric Halpern (JD 2019) | $351.93* | Melinda Arbuckle (JD 2011) |
| $650.16* | Ashley Wright (JD 2018) | $351.73* | Jennifer McCoy (JD 2016) |
| $639.50* | Christine Neill (JD 1996) | $340.00* | Ryan Toomey (JD 2011) |
| $639.50* | Jane Legler (JD 1992) | $308.31* | Benjamin Michael (JD 2013) |
| $634.17* | Barry S. Hersh (JD 1998) | $308.31* | Michael L. Parsons (JD 2011) |
| $633.45* | J. Derek Braziel (JD 1995) | $287.99* | Matthew F. Amos (JD 2015) |
| $624.10* | John Jansonius (JD 1980) | $276.15* | Jennifer Birdsall (JD 2017) |
| $610.46* | Robert E. McKnight, Jr. (JD 1992) | $262.46* | Hannah P. Parks (JD 2014) |

† Courts note the relevant community for fees is district-wide—not by city or division. *See, e.g., Lewallen v. City of Beaumont*, 394 Fed. Appx. 38, 46 (5th Cir. 2010); *Treadway v. Otero*, No. 2:19-CV-244 (Doc. 157) at p. 9 (S.D. Tex. Oct. 6, 2020) (citing cases and concluding: "When it comes to parsing between divisions, it appears that it is the district, rather than the division, that should govern the decision.").



## Classes of the 1970s: The Rates

# Hal K. Gillespie (JD 1972)

**$900.72***



# Russell W. Budd (JD 1979)



**$863.28***

# *Classes of the 1970s: The Work*



**\* Hal K. Gillespie (class of '72):** Mr. Gillespie works in Dallas. His online biography states that he "represents individual clients, corporate executives and unions in arbitration, mediation, civil trials, and appeals involving discharge, discrimination, sexual harassment, breach of contract, and employment matters." On March 2, 2012, Judge Ken Molberg (now Justice Molberg of the Dallas Court of Appeals) ruled $685.00 per hour was a "reasonable" rate for Mr. Gillespie in a Dallas employment retaliation case. *See Rush Truck Centers of Texas, L.P. v. Fitzgerald*, No. DC-09-15958-D (95th District Court for Dallas County, Texas) ("Order on Attorney Fees") at p. 5 (95th District Court for Dallas County, Texas) ("a reasonable fee for the necessary services of Fitzgerald's attorneys, as established by the evidence, should be computed in the following manner: . . . *Hal Gillespie*: $127,410 (186 hours at the rate of $685 per hour) . . . ."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 31.49% higher in 2022 versus 2012 (a $215.72 difference).[1] So, adjusted *only* for such inflation from the year of Judge Molberg's ruling (2012) to the end of 2022, that $685.00 hourly rate for Mr. Gillespie is $900.72.

**\* Russell W. Budd (class of '79):** Mr. Budd works in Dallas. His online biography notes that he "devoted his entire career to championing the rights of people and communities harmed by corporate malfeasance." On May 8, 2015, Judge Jane Boyle ruled Mr. Budd's requested hourly rate of $700.00 was reasonable in a Dallas FLSA case. *See Olibas v. Native Oilfield Servs., LLC*, No. 3:11-cv-2388-B (Doc. 302) at pp. 29-30, PageID 12795-96 (N.D. Tex. Dallas) ("Russell Budd . . . Hourly Rate . . . $700 . . . Nor do Defendants challenge the reasonableness of the hourly rates claimed by each of Plaintiffs' attorneys, which the Court finds to be reasonable based on the declarations submitted in support."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 23.33% higher in 2022 versus 2015 (a $163.28 difference).[2] Adjusted *only* for such inflation from the date of Judge Boyle's 2015 ruling to the end of 2022, that $700.00 hourly rate for Mr. Budd is $863.28.

---

[1] https://www.officialdata.org/Legal-services/price-inflation/2012-to-2022?amount=685

[2] https://www.officialdata.org/Legal-services/price-inflation/2015-to-2022?amount=700

# *Classes of the 1980s*



# 9 lawyers listed

# $976.23 average rate

# $1,038.67 median rate

Fee Petition
APP. 000046



## Classes of the 1980s: The Rates

**$1,230.00***



Laura Petroff (JD 1980)

**$1,055.18***



Patrick S. Casey (JD 1984)

**$864.92***



Norlynn B. Price (JD 1984)

**$1,210.50***



Steven Stodghill (JD 1987)

**$1,038.67***



Charla Aldous (JD 1985)

**$801.62***



Brian P. Sanford (JD 1986)

**$1,082.20***



Rogge Dunn (JD 1983)

**$878.91***



Susan Hutchison (JD 1987)

**$624.10***



John Jansonius (JD 1980)

# *Classes of the 1980s: The Work*



\* **Laura Petroff (class of '80):** Ms. Petroff works in Los Angeles. Her online biography states that she has "more than 30 years of experience as a labor and employment litigator and counselor . . . ." In 2022, her law firm sought fees at the rate of $1,230 per hour for her work in a Dallas bankruptcy case. *See In re: Fore Mach.*, No. 22-40487 (Doc. 627-2) at p. 2 (Bankr. N.D. Tex. May. 16, 2022) ("Laura Petroff . . . Position with Winston and Practice Area . . . Partner — Labor & Employment . . . Hourly Billing Rate . . . $1,230.00"). On November 14, 2022, Judge Mark X. Mullin approved the fee request. *See id.* (Doc. 630).

\* **Steven Stodghill (class of '87):** Mr. Stodghill works in Dallas. His online biography states that he has "a broad range of experience in complex commercial litigation, representing both plaintiffs and defendants in . . . employment litigation . . . ." In 2022, his law firm billed $1,210.50 per hour (representing his hourly rate of $1,345.00 per hour minus a 10% discount) for his work defending an alleged employment discrimination case in Fort Worth. *See Thomas v. Cook Children's Health Care Sys.*, No. 4:20-cv-01272-O (Doc. 138-3) at p. 199, PageID 11595 (N.D. Tex. Fort Worth) (law firm invoice dated April 22, 2022, attached to Declaration of Geoffrey S. Harper: "S. Stodghill . . . Rate . . . 1,345.00"); *see id.* at p. 198, Page ID 11594 ("Less 10% Discount").

\* **Rogge Dunn (class of '83):** Mr. Dunn works in Dallas. His online biography notes that he handles employment matters and is a board-certified specialist in labor and employment law. On September 11, 2020, he testified that he regularly charges $1,000.00 per hour for his work. *See* Affidavit of Rogge Dunn in Support of Motion for Default Judgment and Proving Up Attorneys' Fees at p. 4, ¶ 10 in *Rogge Dunn Group, PC v. Gross*, No. CC-20-01746-D (County Court at Law No. 4 for Dallas County, Texas) ("The hourly fee for such work that I regularly charge is $1,000.00 per hour, which in my opinion is reasonable for such work done in Dallas County, Texas."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 8.22% higher in 2022 versus 2020 (a $82.20 difference).[1] Adjusted

---

[1] https://www.officialdata.org/Legal-services/price-inflation/2020-to-2022?amount=1000

*only* for such inflation from the year of this billing rate (2020) to the end of 2022, that $1,000.00 hourly rate for Mr. Dunne is $1,082.20.

\* Patrick S. Casey (class of '84): Mr. Casey works in Chicago. His online biography notes that "[f]or more than 30 years, he has practiced in all aspects of labor and employment law." In 2021, his law firm sought fees at the rate of $990.00 per hour (representing his hourly rate of $1,100.00 per hour minus a 10% discount) for his work in a Dallas bankruptcy case. *See In re: Highland Capital Mgmt., L.P.*, No. 19-34054-sgj11 (Doc. 2904) at pp. 7, 9 (Bankr. N.D. Tex. Dallas Oct. 8, 2021) ("Patrick S. Casey . . . Senior Counsel Labor/Employment . . . Hourly Billing Rate . . . $1,100 . . . 10% Discount"). On November 29, 2021, Judge Stacey G. C. Jernigan approved the fee request. *See id.* (Doc. 3057). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 6.58% higher in 2022 versus 2021 (a $65.18 difference).[2] Adjusted *only* for such inflation from the year of this discounted rate billed (2021) to the end of 2022, that $990.00 discounted hourly rate for Mr. Casey is $1,055.18.

\* Charla Aldous (class of '85): Ms. Aldous works in Dallas. On July 27, 2010, Judge Jane Boyle awarded Ms. Aldous a rate of $750.00 per hour in a Dallas employment retaliation case. *See Nassar v. University of Texas Southwestern Medical Center*, No. 3:09-CV-1337 (Doc. 160) at pp. 8–10, PageID 2245–47 (N.D. Tex. Dallas) ("Defendant argues that Dr. Nassar has not met his burden and that the rates requested ($400 per hour for Mr. Walker, $500 per hour for Mr. Lauten, $500 per hour for Ms. Lauten, and $750 per hour for Ms. Aldous) are excessive. . . . In light of the degree of success obtained and the evidence submitted, the Court finds that the lodestar may be calculated using the requested rates, with one exception [applicable to Ms. Lauten]."), *reversed on other grounds*. According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 38.49% higher in 2022 versus 2010 (a $288.67 difference).[3] Adjusted *only* for such inflation from the year of Judge Boyle's ruling (2010) to the end of 2022, that $750.00 hourly rate for Ms. Aldous is $1,038.67.

\* Susan Hutchison (class of '87): Ms. Hutchison works in Fort Worth. Her online biography notes that she focuses her practice on employment and personal injury matters. On April 14, 2022, Judge Melody Wilkinson awarded Ms. Hutchison fees requested based, in part, on a rate of $878.91 per hour for prosecuting an employment discrimination and retaliation case. *See Mott v.*

---

[2] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=990

[3] https://www.officialdata.org/Legal-services/price-inflation/2010-to-2022?amount=750

*Tesmec USA, Inc.*, Cause No. 017-304893-18 (17th Judicial District Court for Tarrant County, Texas) (*compare* Final Judgment dated April 14, 2022 at p. 3, ¶ 5, awarding "[t]he sum of $285,894.11 as reasonable and necessary Plaintiff's attorney's fees in this case through the date of the Judgment for the prosecution of this case, . . . ." *with* Plaintiff's Motion for Attorneys' Fees, Expert Fees, and Costs filed March 30, 2022, with attached Exhibit 1 Affidavit for Attorney's Fees at pp. 4-5, "Plaintiff seeks fees for work at an hourly rate of $878.91 per hour for me from March 15, 2020 through appeal . . . we are asking the Court to award $286,906.61 as the attorney's fees through the trial of this case, . . . .").

\* Norlynn B. Price (class of '84): Ms. Price previously worked in Dallas. In 2016, she billed $725.00 per hour in a Dallas FLSA case. *See Areizaga v. ADW Corp.*, No. 3:14-cv-2899 (Doc. 94-2) at p. 6, PageID 1057 (N.D. Tex. Dallas) (law firm invoice dated February 10, 2016, attached to Declaration of Danielle Alexis Matthews: "Norlynn B. Price . . . Rate . . . $725"). *See generally id.* (Doc. 7) (Brief in Support of ADW Corporation's Motion to Dismiss Plaintiff's Original Complaint: discussing nature of the case). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 19.30% higher in 2022 versus 2016 (a $139.92 difference).[4] Adjusted *only* for such inflation from the year of this billing rate (2016) to the end of 2022, that $725 hourly rate for Ms. Price is $864.92.

\* Brian P. Sanford (class of '86): Mr. Sanford works in Dallas and specializes in employment law. On December 28, 2015, Judge Barbara M. G. Lynn awarded $650.00 per hour for Mr. Sanford's time prosecuting a Dallas employment retaliation case — based, in part, on the recommendation of Magistrate Judge David L. Horan. *See Kostić v. Texas A&M Univ.–Commerce*, No. 3:10-cv-02265-M (Doc. 282) (N.D. Tex. Dallas) (Order Accepting Findings and Recommendation of the United States Magistrate Judge); *id.* (Doc. 281) at pp. 6 & 10, PageID 8215 & 8219 ("Findings, Conclusions, and Recommendation of the United States Magistrate Judge") ("Plaintiff seeks $420,732.00 for work done by his lead counsel, Brian P. Sanford, for 637.28 hours at an hourly billing rate of $650.00 ($414,232.00) for work done prior to the filing of the original motion for fees and 10 hours at an hourly billing rate of $650.00 ($6,500.00) for work done after the original motion was filed. . . . Defendant does not challenge the hourly rates charged by Plaintiff's attorneys, the costs of court, or postjudgment interest request."). On November 15, 2018, Judge Mark Greenberg ruled in a bench trial on fees that Mr. Sanford's requested rate of $725.00 per hour was reasonable for work he did in *Carpenter v. Southwest Housing Dev. Co., Inc.*, Cause No. CC-08-2072-E (Dallas County Court at Law No. 5) (read into record at trial on fees)—a Dallas unlawful employment practices case involving refusal to pay earned

---

[4] https://www.officialdata.org/Legal-services/price-inflation/2016-to-2022?amount=725

compensation. Judge Greenberg then applied a 1.5 multiplier to fees. On May 30, 2017, Judge Ken Molberg (now Justice Molberg of the Dallas Court of Appeals) awarded Mr. Sanford $685.00 per hour for his work in trying *Clark v. Everlight Americas, Inc.*, No. DC-15-05538 (95th District Court for Dallas County, Texas)— a Dallas employment discrimination and retaliation case. According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 23.33% higher in 2022 versus 2015 (the year of Judge Lynn's ruling) — a $151.62 difference.[5] Adjusted *only* for such inflation from the year of Judge Lynn's ruling (2015) to the end of 2022, that $650.00 hourly rate for Mr. Sanford is $801.62.

## * John Jansonius (class of '80): Mr. Jansonius works in Dallas and specializes in employment law. On October 18, 2018, Magistrate Judge David L. Horan ruled that the requested hourly rate of $565 was reasonable for Mr. Jansonius's time defending against a *pro se* motion to compel in a Dallas employment discrimination case. *See Stancu v. Hyatt Corp.*, No. 3:17-cv-675-S-BN (Doc. 119) at pp. 9-10, PageID 1998-99 (N.D. Tex. Dallas) (". . . Mr. Jansonius's billing rate in this case was $565 per hour . . . The Court further finds that the hourly rates are reasonable and within the market rate for attorneys . . . ."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 10.46% higher in 2022 versus 2018 (the year of Magistrate Judge Horan's ruling) — a $59.10 difference.[6] Adjusted *only* for such inflation from the year of that ruling (2018) to the end of 2022, that $565.00 hourly rate for Mr. Jansonius is $624.10.

---

[5] https://www.officialdata.org/Legal-services/price-inflation/2015-to-2022?amount=650

[6] https://www.officialdata.org/Legal-services/price-inflation/2018-to-2022?amount=565

## *Classes of the 1990s*



# 31 lawyers listed

# $761.79
**average rate**

# $633.45
**median rate**



# Classes of the 1990s: The Rates


**$1,414.90***
Amy A. Null
(JD 1991)


**$895.50***
Cardelle Spangler
(JD 1997)


**$610.46***
Robert E. McKnight, Jr. (JD 1992)


**$541.42***
Howard L. Steele, Jr. (JD 1996)


**$1,413.89***
Shane M. Tucker
(JD 1999)


**$872.04***
Joel M. Fineberg
(JD 1991)


**$595.11***
Trey Branham
(JD 1999)


**$540.00***
Andrew M. Gould
(JD 1994)


**$1,189.48***
Laura E. Schneider
(JD 1992)


**$854.69***
Matthew R. Scott
(JD 1995)


**$595.11***
Jeffrey Goldfarb
(JD 1994)


**$538.93***
Peter A. Milianti
(JD 1997)


**$1,157.95***
John E. Fitzsimmons
(JD 1995)


**$670.80***
Richard E. Norman
(JD 1993)


**$590.53***
Robert G. "Bobby" Lee
(JD 1993)


**$525.00***
Douglas B. Welmaker
(JD 1993)


**$1,125.49***
Cathryn Le Regulski
(JD 1999)


**$639.50***
Christine Neill
(JD 1996)


**$570.22***
Michael A. McCabe
(JD 1998)


**$520.00***
Christopher Collins
(JD 1999)


**$1,057.50***
Geoffrey Harper
(JD 1995)


**$639.50***
Jane Legler
(JD 1992)


**$570.22***
David L. Wiley
(JD 1996)


**$503.08***
Daniel E. Farrington
(JD 1998)


**$1,039.50***
Thomas Walsh
(JD 1992)


**$634.17***
Barry S. Hersh
(JD 1998)


**$570.22***
Amy E. Gibson
(JD 1995)

**$493.30***
David Langenfeld
(JD 1992)


**$938.91***
Marc D. Katz
(JD 1994)


**$633.45***
J. Derek Braziel
(JD 1995)


**$546.99***
Jason Smith
(JD 1992)



# *Classes of the 1990s: The Work*



* <span style="color:red">Amy A. Null (class of '91):</span> Ms. Null works in Boston. Her online biography states that she "has broad experience advising employers and financial industry service providers on ERISA, federal income tax law, and other rules and regulations concerning employee benefit plans." In 2021, her law firm sought fees at the rate of $1,327.50 per hour (representing her hourly rate of $1,475 per hour minus a 10% discount) for this sort of work she did in a Dallas bankruptcy case: "Review of deferred bonus plan and consider termination of same; communication with Mr. Stauber re same; call with client and Mr. Stauber re approach to termination/forfeiture of bonus payments." *See In re: Highland Capital Mgmt.*, No. 19-34054 (Doc. 2907) at p. 61 (Bankr. N.D. Tex. Dallas Oct. 8, 2021); *id.* at pp. 70-72 ("Timekeeper . . . Null, Amy A. . . . Rate . . . 1,475.00 . . . Less 10% Discount"). On November 22, 2021, <span style="color:red">Judge Stacey G. C. Jernigan</span> approved the fee request containing Ms. Null's discounted rate and time. *Compare id.* (Doc. 2907) at p. 2 ("Amount of Final Fees sought as Actual, Reasonable and Necessary[]: $2,645,729.72[]") *with* (Doc. 3048) at p. 3 ("WilmerHale is granted final allowance of compensation in the amount of $2,645,729.72 for the Final Compensation Period."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services were 6.58% higher in 2022 versus 2021 (a $87.40 difference).[1] Adjusted *only* for such inflation from the year this discounted rate was court-approved (2021) to the end of 2022, that discounted $1,327.50 hourly rate for Ms. Null is $1,414.90.

* <span style="color:red">Shane M. Tucker (class of '99):</span> Mr. Tucker works in Dallas. His online biography states that he "advises employers, executives, and management teams on the tax and securities law implications of compensatory arrangements . . . also advises clients on the design and administration of retirement plans, welfare plans, and payroll practices." In 2018, his law firm sought fees at the rate of $1,280.00 per hour for this sort of work in a Dallas bankruptcy case: "Telephone conference with David Meyer regarding separation and employment agreements (.5); review employment agreements (1.0); review and revise consulting and separation agreement (3.3) . . . Review and revise separation and consulting agreements." *See In re: Taco Bueno Restaurants, Inc.*, No. 18-33678 (Doc. 308) at pp.

---

[1] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=1327.50

100–01 (Bankr. N.D. Tex. Dallas Feb. 14, 2019) (listing rate as "$1280.00"). On March 28, 2019, Judge Stacey G. C. Jernigan approved the fee request. *See id.* (Doc. 338). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services were 10.46% higher in 2022 versus 2018 (a $133.89 difference).[2] Adjusted *only* for such inflation from the year of this rate billed (2018) to the end of 2022, that $1,280.00 hourly rate for Mr. Tucker is $1,413.89.

* Laura E. Schneider (class of '92): Ms. Schneider works in Boston. Her online biography states that she "counsels clients on all aspects of labor and employment law." In 2021, her law firm sought fees at the rate of $1,116.00 per hour (representing her hourly rate of $1,240.00 per hour minus a 10% discount) for this work in a Dallas bankruptcy case: "Telephone from Mr. Stauber regarding termination." *See In re: Highland Capital Mgmt.*, No. 19-34054 (Doc. 2907) at p. 58 (Bankr. N.D. Tex. Dallas Oct. 8, 2021); *id.* at pp. 70-72 ("Timekeeper . . . Schneider, Laura E. . . . Rate . . . 1,240.00 . . . Less 10% Discount"). On November 22, 2021, Judge Stacey G. C. Jernigan approved the fee request containing Ms. Schneider's discounted rate and time. *Compare id.* (Doc. 2907) at p. 2 ("Amount of Final Fees sought as Actual, Reasonable and Necessary[]: $2,645,729.72[]") *with* (Doc. 3048) at p. 3 ("WilmerHale is granted final allowance of compensation in the amount of $2,645,729.72 for the Final Compensation Period."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services were 6.58% higher in 2022 versus 2021 (a $73.48 difference).[3] Adjusted *only* for such inflation from the year this discounted rate was court-approved (2021) to the end of 2022, that discounted $1,116.00 hourly rate for Ms. Schneider is $1,189.48.

* John E. Fitzsimmons (class of '95): Mr. Fitzsimmons works in California. His online biography states that he "concentrates in defense of employers in wrongful termination, employment discrimination, harassment, retaliation and other employment-related litigation in state and federal courts." In 2020, Mr. Fitsimmons billed the rate of $1,070.00 for employment law work done in a Dallas bankruptcy case. *See In re: Trivascular Sales LLC*, No. 20-31840 (Doc. 436-4) at p. 2 and (Doc. 436-7) at pp. 140–43, 172 (Bankr. N.D. Tex. Dallas Oct. 31, 2020) (Exhibit D [Summary of Hourly Fees by Professionals and Paraprofessionals] and Exhibit G [Invoices for the Compensation Period] attached to First and Final Application of DLA Piper LLP (US) for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Counsel to the Debtors for (I) the Period from July 5, 2020 through October 1, 2020; and (II) the

---

[2] https://www.officialdata.org/Legal-services/price-inflation/2018-to-2022?amount=1280

[3] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=1116

Post-Effective Date Period) (for work such as "Strategize regarding employee complaint, departing HR employee, and potential internal investigation; exchange correspondence with Susan Hanstad regarding same; review anonymous complaint and outline questions for more specific information; review IM communications with departing HR employee and strategize regarding same; review employee handbook regarding relevant policies."). On December 3, 2020, Judge Stacey G. C. Jernigan approved the fee request with a Trustee stipulated reduction. *See id.* (Docs. 454 & 458). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 8.22% higher in 2022 versus 2020 (a $87.95 difference).[4] Adjusted *only* for such inflation from the year of this rate billed (2020) and awarded to the end of 2022, that $1,070.00 hourly rate for Mr. Fitzsimmons is $1,157.95.

\* Cathryn Le Regulski (class of '99): Ms. Regulski works in Washington D.C. Her online biography states that her "practice has a particular emphasis on handling complex employee issues resulting from mergers and acquisitions (both buy-side and sell-side), financings, spinoffs and divestitures, and public offerings.")." In 2020, when she was based in Virginia, she billed the rate of $1,040.00 for employment work done in a Dallas bankruptcy case. *See In re: Trivascular Sales LLC*, No. 20-31840 (Doc. 436-4) at p. 2 and (Doc. 436-7) at pp. 72–73, 121 (N.D. Tex. Bankruptcy Oct. 31, 2020) (Exhibit D [Summary of Hourly Fees by Professionals and Paraprofessionals] and Exhibit G [Invoices for the Compensation Period] attached to First and Final Application of DLA Piper LLP (US) for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Counsel to the Debtors for (I) the Period from July 5, 2020 through October 1, 2020; and (II) the Post-Effective Date Period) (for work such as "Email correspondence with Reyna Fernandez regarding leave issues" and "Teleconference with Reyna Fernandez and Steffanie Cook regarding leave and job protection" and "Review and analyze noncompete agreement for Kevin Cofran and prior communications regarding same (0.2); teleconference with Steffanie Cook regarding cease and desist letters (0.2); attention to drafting of cease and desist letters (0.2)"), fee request approved with Trustee stipulated reduction in (Docs. 454 & 458). On December 3, 2020, Judge Stacey G. C. Jernigan approved the fee request with a Trustee stipulated reduction. *See id.* (Docs. 454 & 458). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 8.22% higher in 2022 versus 2020 (a $85.49 difference).[5] Adjusted *only* for such inflation from the year this rate was billed and awarded (2020) to the end of 2022, that $1,040.00 hourly rate for Ms. Regulski is $1,125.49.

---

[4] https://www.officialdata.org/Legal-services/price-inflation/2020-to-2022?amount=1070

[5] https://www.officialdata.org/Legal-services/price-inflation/2020-to-2022?amount=1040

\* **Geoffrey Harper (class of '95):** Mr. Harper works in Dallas. His online biography states that he "is a trial lawyer who concentrates his practice on [various areas, including] employment disputes." In 2022, his law firm billed $1,057.50 per hour (representing his hourly rate of $1,175.00 per hour minus a 10% discount) for his work defending an alleged employment discrimination case in Fort Worth. *See Thomas v. Cook Children's Health Care Sys.*, No. 4:20-cv-01272-O (Doc. 138-3) at p. 199, PageID 11595 (N.D. Tex. Fort Worth) (law firm invoice dated April 22, 2022, attached to Declaration of Geoffrey S. Harper: "G. Harper . . . Rate . . . 1,175.00"); *see id.* at p. 198, Page ID 11594 ("Less 10% Discount").

\* **Thomas Walsh (class of '92):** Mr. Walsh works in Dallas. His online biography states that he is an accomplished trial lawyer. In 2022, his law firm billed $1,039.50 per hour (representing his hourly rate of $1,155.00 per hour minus a 10% discount) for his work defending an alleged employment discrimination case in Fort Worth. *See Thomas v. Cook Children's Health Care Sys.*, No. 4:20-cv-01272-O (Doc. 138-3) at p. 88, PageID 11484 (N.D. Tex. Fort Worth) (law firm invoice dated January 11, 2022, attached to Declaration of Geoffrey S. Harper: "T. Walsh . . . Rate . . . 1,155.00"); *see id.* ("Less 10% Discount").

\* **Marc D. Katz (class of '94):** Mr. Katz works in Dallas. His online biography says he "has a broad-based and sophisticated management-side labor and employment litigation practice." He billed for work on a motion to dismiss in an alleged theft of trade secrets case in Dallas involving former employees of a company, in *Medoc Health Servs., LLC v. Nguyen*, No. DC-18-0822 (14th District Court for Dallas County, Texas). An invoice dated March 23, 2018, lists his rate as $850.00 per hour in that year. *See* Exhibit C attached to Plaintiff's Motion for Attorneys' Fees, filed on November 20, 2020, at p. 55. According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 10.46% higher in 2022 versus 2018 (a $88.91 difference).[6] Adjusted *only* for such inflation from the year of this rate billed (2018) to the end of 2022, that $850.00 hourly rate for Mr. Katz is $938.91.

\* **Cardelle Spangler (class of '97):** Ms. Spangler works in Chicago. Her online biography states that she "has concentrated her practice on employee relations litigation and counseling matters." In 2022, her law firm billed $895.50 per hour (representing her hourly rate of $995.00 per hour minus a 10% discount) for her work defending an alleged employment discrimination case in Fort Worth. *See Thomas v. Cook Children's Health Care Sys.*, No. 4:20-cv-01272-O (Doc. 138-3) at p. 199, PageID 11595 (N.D. Tex. Fort Worth) (law firm invoice dated April

---

[6] https://www.officialdata.org/Legal-services/price-inflation/2018-to-2022?amount=850

22, 2022, attached to Declaration of Geoffrey S. Harper: "C. Spangler . . . Rate . . . 995.00"); *see id.* at p. 198, Page ID 11594 ("Less 10% Discount").

**\* Joel M. Fineberg (class of '91):** Mr. Fineberg works in Dallas. On August 4, 2011, Judge Royal Furgeson determined that the rate of $650.00 per hour was a reasonable one for work Mr. Fineberg did in a Dallas FLSA case. *See Spence v. Irving Holdings, Inc.*, No. 3:10-cv-142-F (Doc. 201) at p. 4, PageID 2414 (N.D. Tex. Dallas) ("Based on documentation provided by the parties, the number of hours worked by Plaintiffs' counsel and personnel, which is not disputed, amounts to over 2,250 hours, including 500 hours at a $650/hour rate by Joel Fineberg; . . . . The Court finds these rates to be reasonable and consistent with hourly rates charged by comparable attorneys in the community for similar work."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 34.16% higher in 2022 versus 2011 (a $222.04 difference).[7] Adjusted *only* for such inflation from the year of this rate awarded (2011) to the end of 2022, that $650.00 hourly rate for Mr. Fineberg is $872.04.

**\* Matthew R. Scott (class of '95):** Mr. Scott works in Dallas and is a board-certified labor and employment law specialist. On December 4, 2013, in an employment discrimination case, Mr. Scott testified that his standard billing rate was $650.00 per hour. *See* Declaration of Matthew R. Scott in *Ratra v. Dean Foods Co.*, No. 3:12-cv-1854 (Doc. 85-1) at p. 3 ¶ 25, PageID 2170 (N.D. Tex. Dallas) ("my standard hourly billing rate today at KLG is $650"). On January 30, 2015, in an employment discrimination case, Mr. Scott also testified that his standard billing rate was $650.00 per hour. *See* Declaration of Matthew R. Scott in *Patton v. ADESA Texas, Inc.*, No. 3:14-cv-3692 (Doc. 30-1) at p. 2 ¶ 22, PageID 1108 (N.D. Tex. Dallas) ("My standard hourly billing rate at KLG is $650, and that has been my billing rate since June 2012"). On January 16, 2014, Judge Phyllis Lister Brown ruled that $600.00 per hour was a reasonable rate for Mr. Scott's work in a disability discrimination in employment case. *See Green v. Dallas County Schools*, No. DC-12-09857 (Order of January 16, 2014) at p. 1 (162d District Court for Dallas County, Texas) ("The Court approves and awards Plaintiff reasonable attorney's fees of $337,750.00, which represents 404.9 hours of Matthew R. Scott's time at a reasonable hourly rate of $600 per hour, . . ."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 31.49% higher in 2022 versus 2012—the year Mr. Matthews testified that his standard hourly billing rate in 2012 was $650 while at former Judge Joe Kendall's law firm (a $204.69

---

[7] https://www.officialdata.org/Legal-services/price-inflation/2011-to-2022?amount=650

difference).[8] Adjusted *only* for such inflation from 2012 to the end of 2022, that $650.00 hourly rate for Mr. Scott is $854.69.

\* **Richard E. Norman (class of '93):** Mr. Norman works in Houston. On August 4, 2011, Judge Royal Furgeson determined the rate of $500.00 per hour was a reasonable one for work Mr. Norman did in a Dallas FLSA case. *See Spence v. Irving Holdings, Inc.*, No. 3:10-cv-142-F (Doc. 201) at p. 4, PageID 2414 (N.D. Tex. Dallas) ("Based on documentation provided by the parties, the number of hours worked by Plaintiffs' counsel and personnel, which is not disputed, amounts to over 2,250 hours, including . . . ; 284.1 hours at a $500/hour rate by Richard Norman. . . . The Court finds these rates to be reasonable and consistent with hourly rates charged by comparable attorneys in the community for similar work."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 34.16% higher in 2022 versus 2011—the year Judge Furgeson determined that $500 rate was reasonable (a $170.80 difference).[9] Adjusted *only* for such inflation from the year of this rate awarded (2011) to the end of 2022, that $500.00 hourly rate for Mr. Norman is $670.80.

\* **Christine Neill (class of '96):** Ms. Neill works in Dallas. Her online biography states that she "limits her practice to representing and advising employee side clients in matters including unlawful termination." On April 20, 2021, former Magistrate Judge Jeff Kaplan served as arbitrator and awarded $600 for Ms. Neill's work prevailing in a Dallas age discrimination in employment case. *See Golden v. Sunridge Mgmt. Group, Inc.*, Cause No. DC-19-09796 (95th Judicial District Court for Dallas County, Texas) (Motion to Confirm Arbitration Award and Brief in Support filed June 14, 2021) (Exhibit B: JAMS Arbitration Final Award, JAMS Arbitration No. 1310024814 at p. 21: "the arbitrator determines that $600.00 is a reasonable hourly rate for Legler and Neill and $550.00 is a reasonable hourly rate for Cole."). On July 22, 2021, Judge Monica Purdy confirmed the arbitration award. *See id.* (Order Confirming Arbitration Award). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 6.58% higher in 2022 versus 2021—the year Judges Kaplan and Purdy determined that $600 rate was reasonable (a $39.50 difference).[10] Adjusted *only* for such inflation from the year of this rate awarded (2021) to the end of 2022, that $600.00 hourly rate for Ms. Neill is $639.50.

---

[8] https://www.officialdata.org/Legal-services/price-inflation/2012-to-2022?amount=650

[9] https://www.officialdata.org/Legal-services/price-inflation/2011-to-2022?amount=500

[10] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=600

\* Jane Legler (class of '92): Ms. Legler works in Dallas. Her online biography states that she "has extensive experience exclusively representing employees in employment related disputes." On April 20, 2021, former Magistrate Judge Jeff Kaplan served as arbitrator and awarded $600 for Ms. Legler's work prevailing in a Dallas age discrimination in employment case. *See Golden v. Sunridge Mgmt. Group, Inc.*, Cause No. DC-19-09796 (95th Judicial District Court for Dallas County, Texas) (Motion to Confirm Arbitration Award and Brief in Support filed June 14, 2021) (Exhibit B: JAMS Arbitration Final Award, JAMS Arbitration No. 1310024814 at p. 21: "the arbitrator determines that $600.00 is a reasonable hourly rate for Legler and Neill and $550.00 is a reasonable hourly rate for Cole."). On July 22, 2021, Judge Monica Purdy confirmed the arbitration award. *See id.* (Order Confirming Arbitration Award). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 6.58% higher in 2022 versus 2021—the year Judges Kaplan and Purdy determined that $600 rate was reasonable (a $39.50 difference).[11] Adjusted *only* for such inflation from the year of this rate awarded (2021) to the end of 2022, that $600.00 hourly rate for Ms. Legler is $639.50.

\* Barry S. Hersh (class of '98): Mr. Hersh works in Dallas. His online biography states that he "dedicates 100 percent of his practice to representing employees and small businesses in employment law matters." On September 7, 2021, Judge David C. Godbey granted $595.00 per hour for Mr. Hersh's work in a Dallas FLSA case. *See Boatright v. Grey*, No. 21-cv-00835-N (Doc. 18) at p. 9, PageID 180 (N.D. Tex. Dallas) ("shall have and recover from such Defendant reasonable attorneys' fees . . . attorney time at $595 per hour; . . ."). On December 28, 2015, Judge Barbara M. G. Lynn awarded $450.00 per hour for Mr. Hersh's time helping select a jury in a Dallas employment retaliation case—based, in part, on the recommendation of Magistrate Judge David L. Horan. *See Kostić v. Texas A&M Univ.–Commerce*, No. 3:10-cv-02265-M (Doc. 282) (N.D. Tex. Dallas) (Order Accepting Findings and Recommendation of the United States Magistrate Judge); *id.* (Doc. 281) at pp. 8 & 10, PageID 8217 & 8219 ("Findings, Conclusions, and Recommendation of the United States Magistrate Judge") ("Plaintiff seeks $2,610.00 for work done by Barry S. Hersh of Hersh Law Firm, P.C., who helped with jury selection and mock trial, for 5.8 hours at an hourly billing rate of $450.00. . . . Defendant does not challenge the hourly rates charged by Plaintiff's attorneys, the costs of court, or postjudgment interest request."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 6.58% higher in 2022 versus 2021—the year Judge Godbey determined that $595 rate was reasonable (a $39.17

---

[11] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=600

difference).[12] Adjusted *only* for such inflation from the year of this rate awarded (2021) to the end of 2022, that $595.00 hourly rate for Mr. Hersh is $634.17.

* **J. Derek Braziel (class of '95):** J. Derek Braziel works in Dallas. On February 28, 2013, Judge Jane Boyle ruled that $495.00 per hour was "reasonable" and "warranted" for J. Derek Braziel in a Dallas FLSA case, *Owens v. Marstek, LLC*, No. 3:11-cv-01435-B (Doc. 26) (N.D. Tex. Dallas) (adopting fees requested in Doc. 24). On February 20, 2014, Magistrate Judge David L. Horan ruled that $495.00 per hour was "reasonable" for Mr. Braziel and "within the market rate for attorneys handling this type of litigation in the Dallas area" in *Farasat v. RP Managing Partners, LLC*, No. 3:13-cv-00270-L (Doc. 46) (N.D. Tex. Dallas)—a Dallas FLSA case. According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 27.97% higher in 2022 versus 2013—the year Judge Boyle ruled that $495.00 per hour was reasonable (a $138.45 difference).[13] Adjusted *only* for such inflation from the year of Judge Boyle's ruling (2013) to the end of 2022, that $495.00 hourly rate for Mr. Braziel is $633.45.

* **Robert E. McKnight, Jr. (class of '92):** Mr. McKnight works in Victoria, Texas. His online biography notes that he "practices in the areas of labor and employment law (including employee rights and benefits, ERISA, wage and hour, and civil rights in employment) and civil rights in housing." On December 28, 2015, Judge Barbara M. G. Lynn awarded $495.00 per hour for Mr. McKnight's time working on attorneys' fees issues in a Dallas employment retaliation case—based, in part, on the recommendation of Magistrate Judge David L. Horan. *See Kostić v. Texas A&M Univ.–Commerce*, No. 3:10-cv-02265-M (Doc. 282) (N.D. Tex. Dallas) (Order Accepting Findings and Recommendation of the United States Magistrate Judge); *id.* (Doc. 281) at pp. 8 & 10, PageID 8217 & 8219 ("Findings, Conclusions, and Recommendation of the United States Magistrate Judge") ("Plaintiff seeks $13,711.50 for work done by Robert E. McKnight, Jr., of counsel to the law firm of Marek, Griffin & Knaupp, who helped prepare the motion for fees and costs, for 14.30 hours at an hourly rate of $495.00 ($7,078.50) for work done prior to the filing of original motion and 13.40 hours at an hourly rate of $495.00 ($6,633.00) for work done after the original motion was filed. . . . Defendant does not challenge the hourly rates charged by Plaintiff's attorneys, the costs of court, or postjudgment interest request."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 23.33% higher in 2022 versus 2015 (a $115.46

---

[12] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=595

[13] https://www.officialdata.org/Legal-services/price-inflation/2013-to-2022?amount=495

difference).[14] Adjusted *only* for such inflation from the year of this ruling (2015) to the end of 2022, that $495.00 hourly rate is $610.46.

\* Trey Branham (class of '99): Mr. Branham works in Dallas. On April 9, 2014, Judge Jorge Solis found a rate of $475.00 per hour was "reasonable for this locality" for the work Mr. Branham did in prosecuting a Dallas FLSA case. *See Parker v. ABC Debt Relief, Ltd.,* No. 3:10-cv-1332-P (Doc. 241) at p. 4, PageID 7059 (N.D. Tex. Dallas) ("Plaintiffs also request that attorneys Branham and Jeffrey Goldfarb be compensated at an hourly rate of $475, . . . . The Court finds that the hourly rates requested by Plaintiffs are reasonable for this locality."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 25.29% higher in 2022 versus 2014 (a $120.11 difference).[15] Adjusted *only* for such inflation from the year of this ruling (2014) to the end of 2022, that $475.00 hourly rate is $595.11.

\* Jeffrey Goldfarb (class of '94): Mr. Goldfarb works in Dallas. On April 9, 2014, Judge Jorge Solis found a rate of $475.00 per hour was "reasonable for this locality" for the work Mr. Goldfarb did in prosecuting a Dallas FLSA case. *See Parker v. ABC Debt Relief, Ltd.,* No. 3:10-cv-1332-P (Doc. 241) at p. 4, PageID 7059 (N.D. Tex. Dallas) ("Plaintiffs also request that attorneys Branham and Jeffrey Goldfarb be compensated at an hourly rate of $475, . . . . The Court finds that the hourly rates requested by Plaintiffs are reasonable for this locality."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 25.29% higher in 2022 versus 2014 (a $120.11 difference).[16] Adjusted *only* for such inflation from the year of this ruling (2014) to the end of 2022, that $475.00 hourly rate is $595.11.

\* Robert G. "Bobby" Lee (class of '93): Mr. Lee works in Dallas. His online biography notes that he "specializes in employment law, representing employers, executives, and other employees in all facets of the employment relationship." On June 14, 2016, Judge Reed O'Connor found a rate of $495.00 per hour for Mr. Lee's work in prosecuting a Fort Worth employment discrimination and retaliation case was "reasonable given the community standards" and Mr. Lee's experience. *See Calahan v. BMJ Food Corp.*, No. 4:15-cv-00251-O (Doc. 29) at p.12, PageID 177 (N.D. Tex. Fort Worth) ("Plaintiff's attorney suggests that associate Megan Leigh Dixon rate of $295 dollars an hour and Robert G. Lee's rate at $495 an hour are reasonable hourly rates. . . . The Court finds that

---

[14] https://www.officialdata.org/Legal-services/price-inflation/2015-to-2022?amount=495

[15] https://www.officialdata.org/Legal-services/price-inflation/2014-to-2022?amount=475

[16] https://www.officialdata.org/Legal-services/price-inflation/2014-to-2022?amount=475

Plaintiff's rates are reasonable given the community standards and Dixon and Lee's experience."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 19.30% higher in 2022 versus 2016 (a $95.53 difference).[17] Adjusted *only* for such inflation from the year of Judge O'Connor's ruling (2016) to the end of 2022, that $495.00 hourly rate is $590.53.

\* Michael A. McCabe (class of '98): Mr. McCabe works in Dallas. His online biography states that he is Co-Chair of the Employment Litigation section of his law firm. An invoice from his firm for some commercial litigation shows his rate was $495.00 per hour in 2017. *See* Firm Invoice dated May 23, 2017, attached to Declaration of Michael A. McCabe accompanying motion for award of fees filed on July 27, 2018, at pp. 284–87, in *Valtech Servs., Inc. v. Cornerstone Staffing Solutions, Inc.*, No. DC-16-10346 (116th Judicial District Court for Dallas County, Texas). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 15.20% higher in 2022 versus 2017 (a $75.22 difference).[18] Adjusted *only* for such inflation from the year of this billing (2017) to the end of 2022, that $495.00 hourly rate is $570.22.

\* David L. Wiley (class of '96): Mr. Wiley works in Dallas and focuses his practice on employment law. On May 30, 2017, Judge Ken Molberg (now Justice Molberg of the Dallas Court of Appeals) awarded Mr. Wiley $495.00 per hour for his work in helping select a jury in *Clark v. Everlight Americas, Inc.*, No. DC-15-05538 (95th District Court for Dallas County, Texas)—a Dallas employment discrimination and retaliation case. On December 12, 2019, a Taylor County jury in Abilene, Texas, awarded Mr. Wiley $500.00 per hour for his work in prosecuting *Chad Carter v. City of Abilene, Texas*, No. 10138-D (350th Judicial District Court for Taylor County, Texas)—an Abilene whistleblower case. *See* Jury Verdict at pp. 6-8, Question 4 ("What is a reasonable attorneys' fee for necessary services provided in this case, stated in dollars and cents? . . . Answer: $764 hours x $500 = $382,000"). On November 15, 2018, Judge Mark Greenberg ruled in a bench trial on fees that Mr. Wiley's requested rate of $495.00 per hour was reasonable for his work in prosecuting *Carpenter v. Southwest Housing Dev. Co., Inc.*, Cause No. CC-08-2072-E (Dallas County Court at Law No. 5) (read into record at trial on fees)—a Dallas unlawful employment practices case involving refusal to pay earned compensation. Judge Greenberg then applied a 1.5 multiplier to fees. *See id.* According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 15.20% higher

---

[17] https://www.officialdata.org/Legal-services/price-inflation/2016-to-2022?amount=495

[18] https://www.officialdata.org/Legal-services/price-inflation/2017-to-2022?amount=495

in 2022 versus 2017—the year of the 2017 *Everlight* decision awarding a $495 per hour rate (a $75.22 difference).[19] Adjusted *only* for such inflation from the year of this decision (2017) to the end of 2022, that $495.00 hourly rate is $570.22.

**\* Amy E. Gibson (class of '95):** Ms. Gibson works in Dallas and focuses her practice on employment law. On May 30, 2017, Judge Ken Molberg (now Justice Molberg of the Dallas Court of Appeals) awarded Ms. Gibson $495.00 per hour for her work in helping select a jury in *Clark v. Everlight Americas, Inc.*, No. DC-15-05538 (95th District Court for Dallas County, Texas)—a Dallas employment discrimination and retaliation case. On December 28, 2015, Judge Barbara M. G. Lynn awarded $450.00 per hour for Ms. Gibson's time helping select a jury in a Dallas employment retaliation case—based, in part, on the recommendation of Magistrate Judge David L. Horan. *See Kostić v. Texas A&M Univ.–Commerce*, No. 3:10-cv-02265-M (Doc. 282) (N.D. Tex. Dallas) (Order Accepting Findings and Recommendation of the United States Magistrate Judge); *id.* (Doc. 281) at pp. 7-8 & 10, PageID 8216-17 & 8219 ("Findings, Conclusions, and Recommendation of the United States Magistrate Judge") ("Plaintiff seeks $720.00 for work done by Amy E. Gibson of Gibson Wiley PLLC, who helped with jury selection, for 1.6 hours of work at an hourly rate of $450.00. . . . Defendant does not challenge the hourly rates charged by Plaintiff's attorneys, the costs of court, or postjudgment interest request."). On December 12, 2019, a Taylor County jury in Abilene, Texas, awarded Ms. Gibson $500.00 per hour for her work as lead counsel in prosecuting *Chad Carter v. City of Abilene, Texas*, No. 10138-D (350th Judicial District Court for Taylor County, Texas)—an Abilene whistleblower case. *See* Jury Verdict at pp. 6-8, Question 4 ("What is a reasonable attorneys' fee for necessary services provided in this case, stated in dollars and cents? . . . Answer: $764 hours x $500 = $382,000"). On November 15, 2018, Judge Mark Greenberg ruled in a bench trial on fees that Ms. Gibson's requested rate of $495.00 per hour was reasonable for her work as lead counsel prosecuting *Carpenter v. Southwest Housing Dev. Co., Inc.*, Cause No. CC-08-2072-E (Dallas County Court at Law No. 5) (read into record at trial on fees)—a Dallas unlawful employment practices case involving refusal to pay earned compensation. Judge Greenberg then applied a 1.5 multiplier to fees. According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 15.20% higher in 2022 versus 2017—the year of the 2017 *Everlight* decision awarding a $495 per hour rate (a $75.22 difference).[20] Adjusted *only* for such inflation from the year of this decision (2017) to the end of 2022, that $495.00 hourly rate is $570.22.

---

[19] https://www.officialdata.org/Legal-services/price-inflation/2017-to-2022?amount=495

[20] https://www.officialdata.org/Legal-services/price-inflation/2017-to-2022?amount=495

\* **Jason Smith (class of '92):** Mr. Smith works in Fort Worth. His online biography notes that he "has developed an expertise as a trial lawyer handling employment, personal injury and insurance cases." On July 23, 2019, Judge Dale Tillery ruled that $500.00 per hour was a "reasonable" hourly fee for his work prosecuting a Dallas employment retaliation case. *See* Findings of Facts and Conclusions of Law in *Benavides v. Macy's Retail Holdings, Inc.*, No. DC-18-10796 at p. 4, ¶ 42 (134th Judicial District Court for Dallas County, Texas) ("$500 is a reasonable hourly fee for Jason Smith in this case."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 9.40% higher in 2022 versus 2019 (a $46.99 difference).[21] Adjusted *only* for such inflation from the year of this decision (2019) to the end of 2022, that $500.00 hourly rate is $546.99.

\* **Howard L. Steele, Jr. (class of '96):** Mr. Steele worked in Houston. He was board certified in labor and employment law. On March 8, 2017, Judge Reed O'Connor ruled $470.00 per hour was a "reasonable" rate for Mr. Steele's work in a Forth Worth FLSA case. *See Pereyra v. Navika Capital Group LLC*, No. 4:15-CV-00615-O (Doc. 83) at p. 4, PageID 3298 (N.D. Tex. Fort Worth) ("In connection with their work performed in the Western District case and this instant case Pereyra seeks hourly rates of $470.00 for partner Howard Steele; . . . . The Court finds that these rates are reasonable."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 15.20% higher in 2022 versus 2017 (a $71.42 difference).[22] Adjusted *only* for such inflation from the year of Judge O'Connor's finding (2017) to the end of 2022, that $470.00 hourly rate is $541.42.

\* **Andrew M. Gould (class of '94):** Mr. Gould works in Dallas. His online biography states that he "represents companies in the defense of federal wage and hour claims, federal and state employment discrimination claims, wrongful discharge claims, unfair labor practice claims under the National Labor Relations Act, contract negotiations, and denial of benefit claims under the Employee Retirement Income Safety Act." On October 7, 2022, Magistrate Judge David L. Horan awarded $540.00 per hour for his work defending a Dallas FLSA case. *See Jorge v. Atlantic Housing Foundation, Inc.*, No. 3:20-cv-02782-N (Doc. 213) at p. 13, PageID 2944 (N.D. Tex. Dallas) ("[B]ased on the Court's review of the submitted materials, the Court finds the appropriate lodestar here to be calculated as a total fee of $22,842.50 based on a total of 53.3 hours of work consisting of 1) 9.4 hours by attorney Andrew Gould at an hourly rate of $540, for a total of $5,076.00; . . . ."); *see also id.* (Doc. 201) at p. 4, ¶ 5, PageID 2876 (Declaration of

---

[21] https://www.officialdata.org/Legal-services/price-inflation/2019-to-2022?amount=500

[22] https://www.officialdata.org/Legal-services/price-inflation/2017-to-2022?amount=470

Molly M. Jones: "Mr. Gould's billing rate for this matter is a *reduced rate* of $540 per hour.").

\* **Peter A. Milianti (class of '97):** Mr. Milianti works in Chicago. His online biography states that his "practice focuses on labor and employment litigation with an emphasis on discrimination lawsuits of all types and whistle-blower retaliation claims." On December 23, 2015, Magistrate Judge David L. Horan found $437.00 per hour was within a reasonable range for Mr. Milianti's work in a Dallas employment discrimination case. *See McAfee v. Schneider Nat'l Carriers, Inc.*, No. 3:14-cv-1500-P (Doc. 52) at p. 12, PageID 200 (N.D. Tex. Dallas) ("The Court finds Mr. Milianti's $437.00 hourly rate to be within the proper range for the prevailing market rate in this legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation"). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 22.33% higher in 2021 versus 2015 (a $101.93 difference).[23] Adjusted *only* for such inflation from the year of Magistrate Judge Horan's finding (2015) to the end of 2022, that $437.00 hourly rate is $538.93.

\* **Douglas B. Welmaker (class of '93):** Mr. Welmaker works in Longview. His online biography notes that "[i]n the last 10 years, he has limited his practice to representing employees who have been wrongfully denied overtime pay in violation of the Fair Labor Standards Act." On January 10, 2022, Magistrate Judge Renee Harris Toliver found that $525.00 per hour was a reasonable rate for Mr. Welmaker's time prosecuting a Dallas FLSA case. *See Hardy v. SDM Hospitality, LLC*, No. 20-cv-3157-S-BK (Doc. 11) at p. 11, PageID 87 (N.D. Tex. Dallas) ("Further, the undersigned finds that counsel's requested hourly rate of $525.00 is reasonable for an attorney practicing in the field of employment law with comparable experience.").

\* **Christopher Collins (class of '99):** Mr. Collins works in Fort Worth. His online biography notes that he "is a general civil trial and appellate practitioner" whose practice areas include "Employment Law." On July 18, 2022, Judge Karen Gren Scholer found the requested rate of $520.00 per hour was reasonable for work prosecuting an ERISA benefits case. *Compare Cloud v. The Bert Bell/Pete Rozelle NFL Player Retirement Plan*, No. 3:20-cv-01277-S (Doc. 262) at p. 4, PageID 31755 (N.D. Tex. Dallas) ("the Court finds that the hourly rates set forth in the Billing Records are reasonable.") *with id.* (Doc. 253) at p. 9, PageID 31276 ("In the billing records attached hereto as Exhibit '3-A', Mr. Collins is referenced as 'CDC'. . . . Mr. Collins's hourly rate is $520.00 per hour.").

---

[23] https://www.officialdata.org/Legal-services/price-inflation/2015-to-2022?amount=437

\* <span style="color:red">Daniel E. Farrington (class of '98):</span> Mr. Farrington works in Washington, D.C. His online biography states that he "has extensive experience with claims involving discrimination, wage and hour law violations, accommodations for disabled employees, the Family and Medical Leave Act, and non-competition agreements." In 2022, he testified that he billed his *discounted* rate of $472.00 per hour after January of 2021 for his work in an alleged employment discrimination case. *See Corrica v. American Airlines*, No. 3:20-cv-00679-B (Doc. 67-1) at pp. 2-3, ¶¶ 6 & 10, PageID 387-88 (N.D. Tex. Dallas) ("My discounted billing rate on this matter from the time this case opened through January 2021 was $440.00 per hour, after which date my discounted billing rate for this matter was $472.00 per hour. . . . Fisher & Phillips LLP has charged Defendant for all of the fees cited above."). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 6.58% higher in 2022 versus 2021 (a $31.08 difference).[24] Adjusted *only* for such inflation from the year Mr. Farrington began billing this discounted rate in this matter (2021) to the end of 2022, that $472.00 hourly rate is $503.08.

\* <span style="color:red">David Langenfeld (class of '92):</span> Mr. Langenfeld works in Austin. His online biography states: "David Langenfeld is Board Certified as a Specialist in Labor and Employment Law. Mr. Langenfeld represents executives, professionals, management-level employees, and businesses in employment-related, general business, and administrative law matters." In 2015, <span style="color:red">Magistrate Judge Irma Ramirez</span> recommended his firm receive $400.00 per hour for Mr. Langenfeld's work in prosecuting an FLSA case in Dallas, and <span style="color:red">Judge Sam A. Lindsay</span> approved that recommendation. *See Mauricio v. Phillip Gaylen, P.C.*, No. 3:14-cv-00064-L (Doc. 41) at p. 3, PageID 286 (N.D. Tex. Dallas Dec. 3, 2015) (Magistrate Judge Irma Ramirez) ("Here, Plaintiffs seek hourly rates of $400 for Douglas B. Welmaker, $400 for David Langenfeld, and . . . . The hourly rates are consistent with the prevailing market rates in this area, . . . ."), *report and recommendation adopted in* (Doc. 44), 2016 WL 1273337, 2016 Wage & Hour Cas. 2d (BNA) 99,007 (N.D. Tex. Dallas Mar. 30, 2016) (Judge Sam A. Lindsay). According to the Consumer Price Index for legal services as generated by the U.S. Bureau of Labor Statistics, the prices for legal services are 23.33% higher in 2022 versus 2015 (a $93.30 difference).[25] Adjusted *only* for such inflation from the year of Magistrate Judge Ramirez's ruling (2015) to the end of 2022, that $400.00 hourly rate is $493.30.

---

[24] https://www.officialdata.org/Legal-services/price-inflation/2021-to-2022?amount=472

[25] https://www.officialdata.org/Legal-services/price-inflation/2015-to-2022?amount=400